William T. PERKS, Plaintiff,

v.

**TOWN OF HUNTINGTON and Susan Scarpati–Reilly, Defendants.**

No. CIV.A. 99–4811.

United States District Court,
E.D. New York.

March 12, 2003.

Edward J. Yule, Law Offices of Edward J. Yule, P.C., Northport, NY, for Plaintiff.

Ernest R. Stolzer, Rains & Pogrebin, P.C., Mineola, NY, Jason L. Abelove, Law Offices of Jason Abelove, Garden City, NY, Charles L. Weintraub, Bronx, NY, for Defendants.

### MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

William Perks ("Perks"), a longtime Harbor Master in the Town of Huntington ("Huntington"), alleges that former Town Councilwoman Susan Scarpati–Reilly ("Scarpati–Reilly") maneuvered herself into a position as one of his supervisors, whereupon she initiated a sexual relationship with him and—once he terminated the relationship—sexually harassed, defamed, and conspired against him. Perks has brought a multi-count complaint against Scarpati–Reilly and Huntington, raising various claims of sexual harassment, defamation, and conspiracy. Huntington has since brought a cross-claim against Scarpati–Reilly, seeking indemnification and contribution should it be held liable on certain of Perks' defamation claims. Scarpati–Reilly and Huntington here move for summary judgment on all claims against them.

## I. INTRODUCTION

### A. Facts[2]

Susan Scarpati–Reilly became a Councilwoman in Huntington in 1994. Huntington's 56.1 Stmt. [Docket No. 68], ¶ 2. During her tenure as Councilwoman, Scarpati–Reilly developed a particular interest in Huntington's response to oil spills in its waters. In 1996, Scarpati–Reilly played an active role in reorganizing Huntington's Oil Spill Response Board and supported a resolution that created the position of Oil Spill Response Manager. Pl's 56.1 Stmt. [Docket No. 81], ¶ 3a. With Scarpati–Reilly's backing, Perks—who had been a Harbor Master in the Town since the early 1980s—was appointed to that position. Id.; Perks 3/8/01 Dep. [Docket No. 57] at 11. Thus, from that point on, Perks simultaneously held the positions of Harbor Master and Oil Spill Response Manager. Huntington's 56.1 Stmt., ¶ 1.

---

1. Of the District of Massachusetts, sitting by designation.

2. As is required in a motion for summary judgment, the following facts are presented in the light most favorable to Perks, the non-moving party. All justifiable inferences have been drawn in favor of Perks for the purposes of this motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Perks and Scarpati–Reilly had known each other in passing since the late 1980s. Scarpati–Reilly 3/12/01 Dep. [Docket No. 50] at 60–61. Once Perks became Oil Spill Response Manager, however, they began to interact on a far more regular basis, as Scarpati–Reilly served as the Town Board's liaison to the Oil Spill Response Board. Perks 3/8/01 Dep. at 31–34. Shortly after Perks assumed his new position, Scarpati–Reilly told him that he would be required to report directly to her. Perks 11/15/00 Dep. [Docket No. 59] at 16. She subsequently instructed him to report to her regularly about oil spills and other problems as they arose and implemented a practice of reviewing his memos before he submitted them to his department head. Perks 3/8/01 Dep. at 35–37. Occasionally, Scarpati–Reilly also assigned Perks to work overtime and instructed him to cover meetings on her behalf. *Id.* at 26; Pl.'s 56.1 Stmt, ¶ 3j. Scarpati–Reilly herself testified in her deposition that during this time, she spoke with Perks hundreds of times per month about issues related to the oil spill response team. Scarpati–Reilly 3/12/01 Dep. at 204–05. Although Perks felt that Scarpati–Reilly's practice of giving him orders directly "put [him] in a tough position," given that he also had other superiors to whom to answer, he did not publicly complain about her treatment of him and generally felt that they had "a good working relationship." Perks 3/8/01 Dep. at 37, 23–24.

During the end of 1996, Perks and Scarpati–Reilly began to go out socially as friends to local diners and taverns. *Id.* at 58–59. In addition to discussing job-related issues, they also began to discuss personal issues, including Perks' pending divorce. *Id.* at 59–60. On one day in February 1997, their relationship turned more intimate. *Id.* at 63. According to Perks, while he and Scarpati–Reilly were working at the Town Hall, Scarpati–Reilly kissed him and subsequently initiated sexual contact. *Id.* at 67–87. Perks was nervous and did not consider himself to be a willing participant in their sexual contact; he did not, however, ask Scarpati–Reilly to stop, in part because "she was the boss." *Id.* at 94–96.

Over the next year and a half, the sexual relationship between Perks and Scarpati–Reilly intensified. *Id.* at 97–98. Although people suspected that the relationship was afoot and often confronted Perks with rumors about his affair with Scarpati–Reilly, he consistently denied that their relationship was romantic. *Id.* at 181. Meanwhile, he and Scarpati–Reilly were regularly having sexual relations, in—among numerous other places—Town Hall offices as well as the Town vehicle (a Ford Bronco). *Id.* at 100 105.

During the course of their relationship, Scarpati–Reilly used her position as Councilwoman to advance Perks' career. Pl.'s 56.1 Stmt., ¶ 3c. She assisted him in obtaining pay increases, a lap-top computer, a new town truck, a $2,500.00 stipend, and additional overtime. *Id.* Scarpati–Reilly also helped Perks pursue various employment grievances against Huntington. *Id.* Perks regarded Scarpati–Reilly as his "rabbi" or "hook" throughout this period.[3] Perks 3/8/01 Dep. at 62.

In August 1998, Perks decided that he wanted to terminate the personal relationship. Perks 3/8/01 Dep. at 140. He believed that Scarpati–Reilly was placing too many demands on him: "[f]inancial demands, paying for things, helping her for

---

3. In his deposition, Perks explained that a "hook" or "rabbi" refers to the person on the Town Board whom "you have a connection with; whether it be political, personal, what- ever ... you are not protected unless you have a hook, a rabbi, a person on the Town Board." *Id.* at 62–63.

political reasons, for her career, and time was the most significant." *Id.* at 135. Shortly after Perks and Scarpati–Reilly returned from a weekend together, he informed her that he wanted to end their personal relationship and expressed his hope that they could continue to have a professional relationship. *Id.* at 140. According to Perks, Scarpati–Reilly responded in an angry and threatening fashion and told him that she would remove him from his position as Oil Spill Response Manager. *Id.* at 141, 196–97.

The relationship between Perks and Scarpati–Reilly deteriorated significantly after that point. According to Perks, Scarpati–Reilly began to engage in a pattern of abusive behavior toward him, both in and outside of the office. Pl.'s 56.1 Stmt., ¶¶ 5–6. She repeatedly stalked him, demanding that they resume their relationship and threatening various consequences if they did not, including "loss of my job, loss of my overtime, that she was going to take away the laptop and the truck, and that she was going to make things extremely difficult." *Id.*; Perks 3/8/01 Dep. at 155. Perks alleges that at one point when he was on duty at Town Hall, Scarpati–Reilly asked him to get into her car and then drove him out of Huntington and into Nassau County. *Id.* at 148. Perks objected to being driven out of Huntington, and attempted to jump out of the moving car as it approached a stoplight on Route 25A in Port Washington. Scarpati–Reilly then grabbed his shirt, ripped it, and alternately threatened him and pled with him to resume the relationship. *Id.* at 148–50. On another occasion, Scarpati–Reilly called Perks into her office, shut the door, and then showed him a letter that she had drafted to Town Attorney James Matthews ("Matthews"), in which she accused Perks of various false charges relating to improper usage of Town equipment. *Id.* at 157, 188–89, 194–95. She then indicated to Perks that she wanted him to beg

for his job by getting down on his knees, which he did. *Id.* at 189.

Perks also alleges that Scarpati–Reilly took concrete steps to alter his job conditions for the worse. She acted to reduce his overtime, and, therefore, his compensation. Pl.'s 56.1 Stmt., ¶ 6f. She also altered his job responsibilities, such that he was no longer responsible for oil spills and was instead supposed to perform clerical work that had previously been performed by various secretaries. Perks 3/8/01 Dep. at 161. In addition, Scarpati–Reilly instructed Phil Nolan, under whom Perks worked, to require Perks to provide him with a piece of paper each day delineating his planned schedule. Perks 11/15/00 Dep. at 127–128. She did not tell Nolan to ask any other employee for such daily schedules. *Id.* at 129–30.

The tension between Scarpati–Reilly and Perks came to a head on the night of February 28, 1999. Perks was working at the Mobil Oil Terminal Distribution Plant in Cold Spring Harbor overseeing an oil transfer. Perks 3/8/01 Dep. at 197. He was then beeped by Scarpati–Reilly, whom he called back. *Id.* at 199. Scarpati–Reilly told him that she wanted to speak to him about a personal health crisis. *Id.* at 200. Perks refused. *Id.* Shortly thereafter, she informed him that she was right there in the parking lot of the Mobil station. *Id.* at 201. Perks told her that he did not want to see her, but at her insistence, he walked over to her car. *Id.* at 203–04. Scarpati–Reilly began to yell at him and then stepped out of her car. Perks 3/9/01 Dep. [Docket No. 58] at 256. After continuing to yell at him for several minutes about personal matters (particularly the fact that Perks had a new girlfriend), she then looked at him and said, "[y]ou are out of uniform." *Id.* at 257–58. Perks responded that if Scarpati–Reilly

objected to his attire, she should bring it up with the department head. *Id.* at 261.

According to Perks, Scarpati–Reilly then responded by hitting him with her right hand on the left side of his head, in the area of his ear and temple. *Id.* at 261–62. Perks told her, "We are done. Our relationship, personal, we are done. We are finished. I'm out of here." *Id.* Scarpati–Reilly then approached him again and grabbed the left sleeve of his jacket. *Id.* at 264. Perks responded by grabbing her arm and attempting to remove it from his sleeve. *Id.* at 264–65. As soon as he broke her hold on him, Scarpati–Reilly started screaming, "You hit me. You hit me." *Id.* at 265. Perks began to run away from her, and she chased him around the parking lot, telling him that she wanted to talk to him. *Id.* at 265–270. Perks refused to get into Scarpati–Reilly's car, ran to the Mobil office, and locked himself inside. *Id.* He then called his girlfriend and warned her that Scarpati–Reilly might be heading for her. *Id.* at 272–73.

Perks subsequently left the office and drove to a friend's house in East Northport to hide his car, fearing that if Scarpati–Reilly saw his car parked outside his home, she would try to approach him. *Id.* at 276–77. When he reached his friend's house in East Northport, Perks explained that he needed to hide his car, and the friend then drove him to his girlfriend's home. *Id.* at 277. When he arrived, his girlfriend told him that Scarpati–Reilly had called her, asking if Perks was there and stating that she wanted Perks' resignation on her desk first thing in the morning. *Id.* at 278. Perks subsequently left a message for Special Assistant Town Attorney Robert DeGregorio ("DeGregorio"), a friend of both Scarpati–Reilly and Perks, stating that Scarpati–Reilly had "whacked"

him. Ex. S to Scarpati–Reilly Mot. for Summ. J. [Docket No. 93] at 57.

Meanwhile, after having called Perks' girlfriend, Scarpati–Reilly drove to Huntington's Second Precinct. There, she told the police officer on duty that she "was Councilwoman of the town, that [she] was at the Mobil station and that [she] had been slapped in the arm by Mr. Perks." Scarpati–Reilly 4/5/01 Dep. [Docket No. 51] at 110. The officer recorded the information in an incident report, and Scarpati–Reilly instructed him to characterize the incident as "harassment" rather than an assault. *Id.* at 111. The officer confirmed that he had "put down harassment," and Scarpati–Reilly said that she wanted to file the incident report. *Id.* at 111–13. The officer then informed Scarpati–Reilly that a plain clothes member of the police department would contact her to follow up but that none was available at that time. *Id.* at 113. Scarpati–Reilly responded by asking "if there was no one available, whatever happened to the pro arrest policy in the Town of Huntington"? *Id.*[4]

Scarpati–Reilly subsequently returned home, where her family was celebrating her son's sixteenth birthday. *Id.* at 126. Later that night, she spoke to DeGregorio, who told her about his messages from Perks. *Id.* at 127–28. Scarpati–Reilly responded that she had been at the Mobil oil transfer station with Perks and that Perks "was crazed ... [and] had hit me." *Id.* at 128.

The next day, Perks called DeGregorio to discuss the incident further. Perks 3/9/01 Dep. at 289–90. He told him about his confrontation with Scarpati–Reilly, their affair, and asked him for help. *Id.* at 292. DeGregorio subsequently attempted to mediate the dispute between Perks and

---

**4.** Scarpati–Reilly has denied that she asked this question because she wanted Perks to be arrested, and she has simply characterized this exchange as "a conversation about the pro arrest policy." *Id.* at 114.

Scarpati–Reilly, at one point trying to reach a solution in which Scarpati–Reilly would drop her criminal charges against Perks if Perks stopped serving as Oil Spill Response Manager and only retained his position as Harbor Master. Pl.'s Am. 56.1 Stmt. [Docket No. 86], ¶ 9b.[5] Perks decided, however, that he was not willing to step down as Oil Spill Response Manager and began to imply to DeGregorio that he might charge Scarpati–Reilly with sexual harassment. *Id.* at ¶ 9c; DeGregorio Dep. at 83–84.

Scarpati–Reilly and DeGregorio subsequently met with Town Attorney Matthews and then with the Suffolk County District Attorney's Office. Pl.'s Am. 56.1 Stmt. at ¶ 9d. When the press caught wind of the controversy, Scarpati–Reilly denied that she had filed a police report against Perks and stated that another individual (George Hoffman) had done so, although she later admitted that this was untrue. DeGregorio Dep. at 127–28; Scarpati–Reilly 5/7/01 Dep. [Docket No. 56] at 260–263; Ex. O to Scarpati–Reilly Mot. for Summ. J., Petrone Dep. at 60–61.[6] The brewing controversy subsequently reached the Town Board, which passed a resolution calling for an independent fact finder to investigate the situation. Petrone Dep. at 49–56.

On May 25, 1999, the Independent Factfinder, Gerald LaBush, issued a thirty-three page report on the situation.[7] In his report, LaBush concluded that although "[i]t is beyond the scope of this report to determine exactly what the nature of the relationship between Perks and Scarpati–

Reilly was during the period of the eighteenth months or so that preceded the incident of February 28th," his investigation had "uncovered substantial evidence, both circumstantial and direct, that casts serious doubts on Ms. Scarpati–Reilly's claims, and more significantly, serious doubts of the propriety of her actions, both before and after the alleged incident." Factfinder's Report at 26, 1. The following week, Scarpati–Reilly was removed from her position as liaison to the Oil Spill Response Board by the Town Supervisor, Frank Petrone ("Petrone"). Petrone Dep. at 73.

Approximately three months after the issuance of the Factfinder's Report, Perks filed the instant lawsuit against Scarpati–Reilly and the Town, alleging, *inter alia,* claims of sexual harassment, civil rights violations, intentional infliction of emotional distress, and defamation (in regard to Scarpati–Reilly's filing a police report against him on the night of February 28).

In response to the allegations against her, Scarpati–Reilly subsequently took out a paid advertisement in the October 27, 1999 edition of the *Suffolk Life* newspaper.[8] The advertisement was entitled "An Open letter from Susan J. Scarpati–Reilly, Esq. Councilwoman," and displayed a copy of the Town of Huntington's seal and masthead in its upper right-hand corner. Ex. M to Scarpati–Reilly's Mot. for Summ. J. Across the bottom of the advertisement were, in very small font, the words: "Not paid for at taxpayer expense. Paid for by Susan K. Scarpati–Reilly and family." *Id.*

---

**5.** There is a formatting error in this document, as there appear to be two sets of subparagraph 9 on pages ten and eleven. The material cited here appears on page eleven.

**6.** Scarpati–Reilly has explained that she lied to the press because Perks had threatened her and her family, and she "was trying to protect

[her]self and [her] family from harm." Scarpati–Reilly 5/7/01 Dep. at 261–62.

**7.** The Independent Factfinder's Report was attached to Perks' Complaint as Exhibit 2.

**8.** The advertisement is attached to Scarpati–Reilly's Motion for Summary Judgment as Exhibit M.

In the text of her letter, Scarpati–Reilly described the Factfinder's Report as a "political hatchet job" and a "mockery." *Id.* With regard to Perks, she stated, among other things, that:

- Perks was a "malcontent employee, known for verbal abuse, who turned to violence against a woman";
- "On February 28, 1999, Mr. Perks struck me"; and
- "Mr. Perks also falsely accused me of traveling to an upstate resort with him for a weekend in 1998. He stole that receipt, which my husband placed in the glove box of our car after we spend [sic] the weekend there for my husband's 51st birthday."

*Id.*

Scarpati–Reilly asserts that she did not consult with anyone in regard to her use of the Town seal and masthead on the top of the advertisement, nor did she receive Huntington's permission to use the seal and masthead in that fashion. Scarpati–Reilly 4/23/01 Dep. [Docket No. 54] at 212–13. She further states that she wrote the letter with the sole assistance of her husband and that only DeGregorio saw it before she sent it out. *Id.* at 213–14; Scarpati–Reilly 5/3/01 Dep. [Docket No. 55] at 91–93. DeGregorio has similarly stated that he read the letter on October 27—shortly before it was published—but did so merely as a friend, and neither changed any words in the letter nor provided Scarpati–Reilly with any legal advice regarding its contents. DeGregorio Dep. at 132–33.

Shortly after the October 27, 1999 publication of Scarpati–Reilly's open letter, Perks amended his complaint to include two defamation claims relating to that let-ter. Am. Compl. ¶¶ 50–82. In its answer to Perks' Amended Complaint, Huntington then asserted a cross-claim against Scarpati–Reilly in regard to these two defamation claims, alleging that Scarpati–Reilly is liable to Huntington for contribution and indemnification of any amount that it is ordered to pay to Perks as a result of these claims. Huntington's Ans. [Docket No. 10], ¶¶ 95–105.

Perks remains an employee of the Town of Huntington. According to him, however, his job has been "dismantled," in terms of "[l]oss of credibility and changed location, change of duties, loss of equipment ... It's no longer Oil Spill Response Manager. That's not the job. And it is no longer Harbormaster. It is something entirely different. It's a nightmare." Perks 3/9/01 Dep. at 390. Moreover, since June 20, 2000, Perks has been out on disability because of a neck injury. Perks 11/15/00 Dep. at 163–165. He is unsure when he will be able to return to work. *Id.*

**B. Procedural Posture**

In January of 2000, Scarpati–Reilly moved to dismiss some of Perks' claims against her. In its opinion on Scarpati–Reilly's motion for dismissal, *Perks v. Town of Huntington*, 96 F.Supp.2d 222 (E.D.N.Y.2000) (Mishler, J.), the district court granted her motion in part and denied it in part.[9] At this point in the litigation, therefore, the following claims remain: (1) Perks' sexual harassment claim against Huntington under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) (and his related request for damages under Section 1981(a)) [claims One and Seven]; (2) Perks' sexual harassment claims against Scarpati–Reilly and Hunt-

9. Specifically, Judge Mishler dismissed Perks' Title VII, intentional infliction of emotional distress, and 42 U.S.C. § 1985(3) claims against Scarpati–Reilly (claims one, five, seven, and nine). Judge Mishler denied her motion to dismiss Perks' state law sexual harass-ment claim under N.Y. Exec. Law § 290 *et seq.* and his defamation claim arising from Scarpati–Reilly's filing of the police report against him. (Scarpati–Reilly did not move to dismiss Perks' other defamation claims against her.)

ington under N.Y. Exec. Law § 296 *et seq.* [claim Two]; (3) Perks' Equal Protection claims against Scarpati–Reilly and Huntington pursuant to 42 U.S.C. § 1983 (and his related request for attorney's fees under Section 1988) [claims Three, Eight, and Ten]; (4) Perks' defamation claims against Scarpati–Reilly and Huntington arising from Scarpati–Reilly's filing of the February 28, 1999 police report against him [claims Four and Six]; (5) Perks' defamation claims against Scarpati–Reilly and Huntington arising from her October 27, 1999 letter in *Suffolk Life* [claims Eleven and Twelve]; and (6) Perks' claim against Huntington under 42 U.S.C. § 1985(3) [claim Nine].[10]

Both Scarpati–Reilly and Huntington here move for summary judgment on all claims against them. In addition, Scarpati–Reilly has moved for summary judgment on Huntington's cross-claim against her in regard to the defamation claims arising from Scarpati–Reilly's October 27, 1999 letter.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate only when the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Binder v. Long Island Lighting*

*Co.,* 933 F.2d 187, 191 (2d Cir.1991) (internal citations and quotation marks omitted).

### B. Perks' Claims

#### 1. Perks' Title VII claim

Perks' Amended Complaint originally stated a claim of sexual harassment under Title VII against both Scarpati–Reilly and Huntington. His Title VII claim against Scarpati–Reilly was dismissed because individual supervisors cannot be held personally liable under Title VII in the Second Circuit. *Perks,* 96 F.Supp.2d at 226–27 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995)) (abrogated on other grounds by *Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Perks' Title VII claim against Huntington, however, suffers no such obstacle and can be considered on the merits.

Title VII provides that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment in the workplace violates Title VII's prohibition against gender discrimination when such harassment fits into one (or both) of two paradigms: (1) quid pro quo; and (2) hostile work environment.

■■■■ Quid pro quo sexual harassment refers to situations in which "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual .... It is enough to show that the supervisor used the employee's acceptance

---

**10.** Because the court dismissed Perks' claim of intentional infliction of emotional distress against *Scarpati–Reilly,* 96 F.Supp.2d at 231, any claim that the Town is vicariously liable for such distress necessarily cannot stand.

or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job." *Karibian v. Columbia University*, 14 F.3d 773, 777–78 (2d Cir.1994) (internal citations and quotation marks omitted), *abrogated on other grounds by Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275 and *Burlington*, 524 U.S. at 764–65, 118 S.Ct. 2257. Employers are strictly liable for quid pro quo harassment committed by supervisors. *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275 and *Burlington*, 524 U.S. at 765, 118 S.Ct. 2257.

By contrast, the hostile work environment paradigm of sexual harassment permits a plaintiff to recover even in the absence of a tangible job action against him. To fit into this paradigm, however, the plaintiff must show that the harassment was so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal citations and quotation marks omitted). Specifically, he must establish both that he subjectively perceived the environment to be abusive and that a reasonable person would have perceived it as such. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In assessing whether a plaintiff has met this standard, the Supreme Court has explained that courts should "look[ ] at all the circumstances," including the frequency of the hostile conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's ability to do his job. *Id.* at 23, 114 S.Ct. 367. In *Burlington* and *Faragher*, a pair of cases decided on the same date in 1998, the Supreme Court clarified the nature of employers' liability for hostile work environment claims that relate to supervisors' conduct. The Court held that an employer is vicariously liable for "an actionable hostile environment created by a supervisor with an immediate or successively higher authority over the employee," unless it can set forth a two-part affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Burlington*, 524 U.S. at 765, 118 S.Ct. 2257.

Both paradigms of sexual harassment are implicated by Perks' allegations. Perks has alleged that when he refused to resume his sexual relationship with Scarpati–Reilly, she retaliated by taking several adverse employment actions against him, including reducing his overtime and changing his job duties. This fits into the quid pro quo model of sexual harassment. Perks has also alleged that Scarpati–Reilly's treatment of him during the months following his termination of their relationship—including, among other things, ordering him to get on his knees and beg for his job, threatening him, pleading with him to resume their relationship, driving him off work premises and refusing to allow him out of the car, and striking him—created an environment that was sufficiently abusive and hostile to be actionable under Title VII. Furthermore, Perks has sufficiently set forth a triable issue as to whether Scarpati–Reilly served as one of his supervisors, given his testimony that she assigned him work, reviewed his memos, and generally ordered him to report directly to her.[11]

11. In the Title VII context, a supervisor is an individual who has the actual or apparent

In its motion for summary judgment, Huntington has not argued that Scarpati–Reilly did not serve as one of Perks' supervisors,[12] nor attempted to set forth the two-part affirmative defense to liability for hostile work environment claims described above. Huntington instead rests its summary judgment motion with respect to Perks' Title VII claim on the argument that Perks has not demonstrated—as he must—that Scarpati–Reilly's alleged harassment against him was motivated by his gender. Huntington's Mem. [Docket No. 67] at 5–6. Rather, Huntington argues, the evidence establishes that Scarpati–Reilly's harassment of Perks was motivated by Perks' termination of their relationship. *Id.* Huntington argues that Perks can, therefore, not make out an actionable Title VII claim even when all of the facts are construed in his favor.

This argument misapprehends the current state of Title VII jurisprudence in the Second Circuit. It is true that a supervisor's differential treatment of an employee on the basis of a romantic relationship between the two does not always give rise to a Title VII violation. For example, the Second Circuit has held that when a supervisor gives preferential treatment to a female employee with whom he is romantically involved, that employee's male colleagues cannot bring a Title VII action on grounds that they were passed over for those desirable benefits. *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 308 (2d Cir.1986). As the *DeCintio* court explained, such plaintiffs "were not prejudiced because of their status as males; rather, they were discriminated against because [the supervisor] preferred his paramour." *Id.*

This does not mean, however, that employees who are themselves the victims of harassment cannot invoke Title VII's protection merely because of their previous relationship with the harasser. In *Babcock v. Frank*, 729 F.Supp. 279 (S.D.N.Y. 1990), a case with facts similar to those alleged here, the court explicitly rejected that argument. There, the plaintiff employee engaged in a consensual physical relationship with her supervisor for over a year; when she terminated the relationship, he made unwelcome sexual advances against her and threatened her with the loss of her job if she did not submit to them. *Id.* at 281. The court held that "Title VII has been held to provide protection against such *quid pro quo* conduct and that protection ought not be withdrawn merely upon a showing that the victim of harassment had in the past entered into a consensual sexual relationship with the perpetrator." *Id.* at 287. It further rea-

---

authority to alter the terms, conditions, and privileges of the plaintiff's employment. *See, e.g., DeWitt v. Lieberman*, 48 F.Supp.2d 280, 288–89 (S.D.N.Y.1999); *Borrero v. Collins Bldg. Servs., Inc.*, No. CIV.A.01–6885–AGS, 2002 WL 31415511, *11 (S.D.N.Y. Oct. 25, 2002). In cases where "there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one." *Burlington*, 524 U.S. at 759, 118 S.Ct. 2257. Here, Perks' allegations set forth a triable issue as to whether Scarpati–Reilly "exercised authority over [him] … such that [she] could be considered [his] 'de facto' supervisor," *DeWitt*, 48 F.Supp.2d at 288, and as to whether

even if she did not, Perks' perception that she did have that authority was reasonable. *See id.* at 288–89 (finding triable issue as to whether defendant was plaintiff's de facto supervisor); *Adeniji v. Admin. for Children Servs., NYC*, 43 F.Supp.2d 407, 431 n. 10 (S.D.N.Y.1999) (same); *Hernandez v. Jackson, Lewis, Schnitzler & Krupman*, 997 F.Supp. 412, 417 (S.D.N.Y.1998) (same).

12. Even had Huntington raised this argument, the argument would have failed in the context of this motion, wherein all reasonable inferences must be drawn against the moving party. As explained above, Perks has created a triable issue on this point.

soned that to interpret such behavior not as gender discrimination, but rather as discrimination " 'on the basis of the failed interpersonal relationship' ... is as flawed a proposition under Title VII as the corollary that 'ordinary' sexual harassment does not violate Title VII when the employer's asserted purpose is the establishment of a 'new interpersonal relationship.' " *Id.* at 288; *see also Chamblee v. Harris & Harris, Inc.,* 154 F.Supp.2d 670, 672–74 (S.D.N.Y.2001) (permitting an employee who had previously had sexual relations with her supervisor to proceed to trial with her hostile work environment claim respecting his behavior toward her after she refused to continue the relationship).

This Court agrees entirely with *Babcock*'s reasoning. Boiled down to its essence, Huntington's argument would mean that once a supervisor has engaged in a consensual relationship with an employee, he subsequently has carte blanche to harass that employee with impunity, even though the same behavior with respect to any other employee would constitute a Ti-

tle VII violation. This argument makes little sense—prudentially or legally—and the Court rejects it.[13] Accordingly, Perks has created a triable issue as to whether he was the victim of sexual harassment in violation of Title VII, and Huntington's motion for summary judgment on Perks' Title VII claims (Count 1 and Count 7) is denied.

**2. Perks' claim under the New York Human Rights Law**

■ Perks has also brought a sexual harassment claim against both Huntington and Scarpati–Reilly pursuant to the New York Human Rights Law (N.Y.HRL). Section 296(1) of the NYHRL renders it unlawful "[f]or an employer ... because of the ... sex ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

---

**13.** The strongest support in the case law for this argument can be found in *Huebschen v. Department of Health and Social Services,* 716 F.2d 1167 (7th Cir.1983). There, shortly after an employee terminated his romantic relationship with his supervisor, the supervisor recommended that his probationary period in a more senior position be terminated. *Id.* at 1169. The supervisor subsequently told the employee that if he ever discussed the circumstances of his demotion, she would "make sure that he lost all of his friends and that everyone knew that he was a chronic liar." *Id.* The court held that these facts did not make out an actionable claim of sexual harassment, because the supervisor's spiteful behavior was motivated not by the employee's male gender, but by the fact that "he was a former lover who had jilted her." *Id.* at 1172.

The subsequent evolution of sexual harassment jurisprudence—such as the Supreme Court's 1986 recognition in *Meritor* of the hostile work environment paradigm—casts doubt on the relevance of the reasoning un-

derlying this opinion. In light of this paradigm, one district court in the Seventh Circuit has interpreted *Huebschen* not to apply to hostile work environment claims at all, and merely to impose a heightened standard for quid pro quo claims. *Keppler v. Hinsdale Township High School District 86,* 715 F.Supp. 862, 868–69 (N.D.Ill.1989). The *Keppler* court reasoned that "[i]f *Huebschen* is to be taken as anything but wrong," it must be read as saying that "when an employer penalizes an employee after the termination of a consensual relationship, a presumption arises that the employer acted not on the basis of gender, but on the basis of the failed interpersonal relationship—a presumption rebuttable only if the employee can demonstrate that the employer demanded further sexual relationships before taking the action he did." *Id.* at 869. Under this interpretation, *Huebschen* would permit both variants of Perks' sexual harassment claim—quid pro quo and hostile work environment—to proceed. In any event, *Huebschen,* a Seventh Circuit case, is not binding upon this Court.

■ In the determination of whether sexual harassment has occurred, claims brought under Title VII and the NYHRL can be evaluated identically. *See, e.g., Sowemimo v. D.A.O.R. Security, Inc.,* 43 F.Supp.2d 477, 484 (S.D.N.Y.1999) ("At least as far as determining whether objectionable actions constitute actionable sexual harassment, claims made under the New York State Human Rights Law ... are similar to those made under Title VII, and can be examined identically for summary judgment purposes."); *DeWitt,* 48 F.Supp.2d at 293 (same). Indeed, the New York Court of Appeals has relied upon Title VII case law to interpret the NYHRL. *See, e.g., Ferrante v. American Lung Ass'n.,* 90 N.Y.2d 623, 629–30, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997).

Thus, the above analysis of the merits of Perks' sexual harassment claim is entirely applicable here. Huntington's argument that Scarpati–Reilly's treatment of Perks was not actionable sexual harassment because it was not motivated by his gender— which is its sole argument in support of summary judgment on this claim as well, Huntington's Mem. at 7–8—is as unpersuasive in the NYHRL context as it is in the Title VII context.

The decision in *Mauro v. Orville,* 259 A.D.2d 89, 697 N.Y.S.2d 704 (3rd Dep't 1999), is not to the contrary. There, a supervisor who had been having an adulterous relationship with an employee ended the affair and then terminated the employee because his wife objected to her presence. *Id.* at 92–93, 697 N.Y.S.2d 704. The court held that such facts did not make out a violation of the NYHRL. *Id.* at 94, 697 N.Y.S.2d 704. It explained that "discrimination against an employee on the basis of a failed voluntary sexual relationship does not *of itself* constitute discrimination because of sex" (emphasis added), and that "a cause of action for sexual harassment is predicated upon, among other things, a showing that the allegedly harassing conduct was unwelcome." *Id.* at 92–93, 697 N.Y.S.2d 704. It noted that "the present record contains no evidence that plaintiff was subjected to any unwelcome sexual conduct following the breakup of the consensual relationship, a fact that is not surprising considering that it was *defendant* who broke off the parties' relationship." *Id.* at 93, 697 N.Y.S.2d 704.

The *Mauro* court's discussion illuminates precisely why Perks—in contrast to the plaintiff in *Mauro*—does have an actionable claim of sexual harassment. Unlike that plaintiff, Perks has alleged the crucial prerequisite: that Scarpati–Reilly subjected him to unwelcome sexual conduct and harassment following his cessation of their relationship. Thus, Perks' allegations, if true, describe actionable sexual harassment under the NYHRL as well as under Title VII.

■ Although it is well established that Title VII and the NYHRL are identical in *determining which circumstances* constitute actionable sexual harassment, courts are divided as to whether they are identical in regard to imposing liability on employers for such harassment. As noted above, with respect to employer liability, the current framework under Title VII is clear: pursuant to the Supreme Court's 1998 holdings in *Faragher* and *Burlington,* employers are automatically liable for quid pro quo harassment and liable for hostile work environment harassment caused by supervisors, unless they can set forth the two-part affirmative defense described above. This approach, however, differs from the New York courts' traditional interpretation of the NYHRL, under which an employer was not liable for an employee's discriminatory acts unless the employer became a party to the act by encouraging, condoning, or approving it. *See Totem Taxi, Inc. v. New York State Human Rights Appeal Bd.,* 65 N.Y.2d 300, 305, 491

N.Y.S.2d 293, 480 N.E.2d 1075 (1985); *Matter of Father Belle Cmty. Ctr. v. New York State Div. of Human Rights*, 221 A.D.2d 44, 53, 642 N.Y.S.2d 739 (4th Dep't 1996). Prior to 1998, the Second Circuit had a similar framework for assessing vicarious employer liability under Title VII.[14] Now that the Supreme Court has altered the Title VII standard, however, there is an unresolved split as to whether the Supreme Court's new standard should apply to NYHRL claims as well, so that they are again in line with claims brought under Title VII.

In *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998), the Second Circuit stated broadly that "because New York courts require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those under Title VII … we can analyze those claims in tandem." It did not, however, directly address this particular question. The New York Court of Appeals has also not yet spoken to the matter.[15] In *Quinn*'s aftermath—when analyzing claims brought under the NYHRL—some

courts have continued to use the restrictive approach to vicarious employer liability outlined by New York courts prior to 1998. *See, e.g.; Sowemimo*, 43 F.Supp.2d at 486; *DeWitt*, 48 F.Supp.2d at 293. Other courts, by contrast, now apply the Supreme Court's *Burlington/Faragher* framework to NYHRL claims as well, interpreting *Quinn* to counsel such an approach. *See, e.g., Wahlstrom v. Metro–North Commuter Railroad Co.*, 89 F.Supp.2d 506, 526 (S.D.N.Y.2000); *Hecht v. GAF Corp.*, No. CIV.A.95–10379–RPP, 1999 WL 249711, *2 (S.D.N.Y. Apr. 28, 1999). Given *Quinn*'s guidance and the longstanding practice of looking to Title VII case law when interpreting the NYHRL, this Court applies the Supreme Court's framework to Perks' NYHRL claim as well as his Title VII claim.[16] Accordingly, the above analysis of Perks' Title VII claim against the Town applies in full here, and Huntington's motion for summary judgment on Perks' NYHRL claim is denied.

The Court now moves to Perks' individual liability claim against Scarpati–Reilly

14. Under that approach, an employer was vicariously liable for a supervisor's harassment only if (a) the supervisor was at a sufficiently high level in the company, or (b) the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, (c) the employer provided no reasonable avenue for the complaint, or (d) the employer knew (or should have known) of the harassment but unreasonably failed to stop it. *See Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.1997). This approach to vicarious employer liability under Title VII was viewed as being very similar to the New York Court of Appeals' approach under the NYHRL, with the one exception that actual, rather than constructive, notice was required under the NYHRL. *See Seepersad* 1998 WL 474205, at *4; *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 432–33 (S.D.N.Y.1998) (describing the traditional NYHRL approach and

the pre–1998 Second Circuit approach as "virtually the same").

15. The Fourth Department, however, has apparently concluded that New York's traditional approach is still applicable, notwithstanding *Burlington* and *Faragher*. *See Vitale v. Rosina Food Prods., Inc.*, 283 A.D.2d 141, 143, 727 N.Y.S.2d 215 (4th Dep't 2001).

16. In addition, the Court notes that in Huntington's motion for summary judgment on this claim, Huntington did not even attempt to argue that the NYHRL imposes a stricter standard for employer liability than does Title VII. Rather, it analyzed Perks' Title VII and NYHRL claims entirely in tandem. *See* Huntington's Mem. at 5–8. *See Hernandez*, 997 F.Supp. at 417–418 (stating, in a motion for summary judgment, that "because Defendant has declined to address the possibly stricter NYHRL standard, it has not placed the matter in issue").

pursuant to the NYHRL. The NYHRL has two provisions under which Scarpati–Reilly could potentially be held individually liable: Sections 296(1) and 296(6).

 As noted above, Section 296(1) of the NYHRL prohibits employers from engaging in sex discrimination, including sexual harassment. An individual supervisor such as Scarpati–Reilly can be sued under Section 296(1) but only if she is shown either to have an ownership interest or the power "to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (per curiam). It is this latter route to liability that Perks alleges is implicated here; no argument has been made that Scarpati–Reilly has any sort of ownership interest in the Town. Most courts have narrowly interpreted this second route to liability as covering only supervisors who, themselves, have the power to hire and fire employees. *See, e.g., Tomka,* 66 F.3d at 1317 (stating that although supervisor had power to review and comment upon plaintiff's performance, he did not have the authority to hire or fire her and thus could not be held liable under Section 296(1)).

 Here, even construing the facts in the light most favorable to Perks, he has not created a triable issue as to whether Scarpati–Reilly herself had the power to hire and fire him. Perks has indeed alleged that Scarpati–Reilly supported his appointment as Oil Spill Response Manager and that she demanded his resignation. It is clear, however, that the Town Board as a whole voted on the resolution that appointed him and that, even after Scarpati–Reilly demanded Perks' resignation, he remained employed. Accordingly, Section 296(1) does not provide an appropriate basis upon which to hold Scarpati–Reilly personally liable under the NYHRL.

Section 296(6) of the NYHRL, however, provides a broader source of personal lia-

bility. Under Section 296(6), it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6). The Second Circuit has interpreted this language to mean that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable" as an aider and abettor under the NYHRL, even if that defendant has neither an ownership interest nor the power to hire and fire. *Tomka,* 66 F.3d at 1317. Although this ruling has been criticized, it is binding upon this Court, as Judge Mishler noted in denying Scarpati–Reilly's motion to dismiss. *Perks,* 96 F.Supp.2d at 228.

 Accordingly, it is clear that Scarpati–Reilly can be held personally liable under the NYHRL pursuant to Section 296(6). Scarpati–Reilly has argued that she cannot be considered an aider or abettor because she was the only individual involved in the alleged sexual harassment of Perks. Scarpati–Reilly's Mem. [Docket No. 88] at 10. The case law, however, does not support that proposition; instead, it suggests that when an employee is held liable under Section 296(6), she is viewed as aiding and abetting the *employer*'s violation. *See Murphy v. ERA United Realty,* 251 A.D.2d 469, 674 N.Y.S.2d 415, 417 (2d Dep't 1998) ("It is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting."); *DeWitt,* 48 F.Supp.2d at 293 (same); *see also Salvatore v. KLM Royal Dutch Airlines,* No. CIV.A.98–2450–LAP, 1999 WL 796172, at *8 (S.D.N.Y. Sept. 30, 1999) (permitting a claim under Section 296(6) to stand against sole employee who participated in discriminatory conduct).

Here, because the Court has concluded that Perks' NYHRL claim against Huntington can stand, and because Scarpati–Reilly was the active participant in the discriminatory conduct that forms the basis of the claim against Huntington, she can be held liable as an aider and abettor. Accordingly, Scarpati–Reilly's motion for summary judgment on Perks' NYHRL claim against her is denied.

### 3. Perks' Section 1983 Claim

Perks' third and final claim relating to Scarpati–Reilly's alleged sexual harassment of him is brought under 42 U.S.C. § 1983. As with Perks' NYHRL claim, the main issue here is not whether Scarpati–Reilly's actions constituted actionable harassment, but whether Scarpati–Reilly and Huntington can be held liable for that harassment.

 Section 1983 provides that "[e]very person who, under color [of law] subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983 (2000). In order to state a claim under Section 1983, a plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and must further allege that this violation was committed by an individual who was acting under the color of state law. *See, e.g., Kern v. Rochester,* 93 F.3d 38, 43 (2d Cir.1996).

 Perks' allegations adequately set forth a violation of his constitutional rights.

The Second Circuit has held that sexual harassment is a form of sex-based discrimination that violates the Equal Protection clause and, hence, gives rise to a Section 1983 cause of action. *Annis v. County of Westchester,* 36 F.3d 251, 254 (2d Cir. 1994). Scarpati–Reilly argues that the standard for actionable sexual harassment under the Equal Protection clause is even higher than that imposed by Title VII— specifically, that only harassment calculated to drive a person out of the workplace qualifies as sexual harassment for the purposes of the Equal Protection clause and Section 1983. Scarpati–Reilly's Mem. at 4; Scarpati–Reilly's Reply Mem. [Docket No. 95] at 2–4. This view apparently derives from the *Annis* court's statement that "[w]hen ... sexual harassment includes conduct evidently calculated to drive someone out of the workplace, the harassment is tantamount to sex discrimination." 36 F.3d at 254. In a later opinion, however, the *Annis* court clarified that "[a]lthough [the defendant's] actions may not have been calculated to force [the plaintiff] to quit, they are nevertheless a basis for recovery." *Annis v. County of Westchester,* 136 F.3d 239, 248 (2d Cir.1998) (internal citations omitted); *see also Shanes–Hernandez v. Clementoni,* 99 F.3d 402 (2d Cir.1995) (unpublished opinion) [17] ("Proof of a Title VII violation, while sufficient to prove sexual harassment under the Equal Protection Clause, is not necessary to prove an Equal Protection violation ... [B]ecause we find that the evidence was sufficient to sustain a jury verdict for appellee for sexual harassment under Title VII, we necessarily find that the sexual

---

**17.** For the propriety of citing an unpublished opinion, see *Anastasoff v. United States,* 223 F.3d 898, 899–905 (8th Cir.2000) (Arnold, J.) (holding that unpublished opinions have precedential effect), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000) (en banc), *Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 103 (D.Mass. 1999) (relying on unpublished opinions' persuasive authority), and Richard S. Arnold, *Unpublished Opinions: A Comment,* 1 J.App. Prac. & Process 219 (1999). *See also* Richard L. Neumeier, *Ethics of Appellate Advocacy: Unpublished Opinions* (Oct.2001) (unpublished seminar paper, on file with author); *but see Hart v. Massanari,* 266 F.3d 1155, 1180 (9th Cir.2001).

harassment verdict was proper under the Equal Protection Clause.") (internal citations and quotation marks omitted). Accordingly, the above analysis of the merits of Perks' sexual harassment claim is equally applicable here. Construing the facts in the light most favorable to Perks, Scarpati–Reilly's treatment of him violated the Equal Protection clause as well as Title VII and the NYHRL.

■ As noted above, to make out a claim under Section 1983, Perks must not only show that his constitutional rights were violated, but must also show that they were violated by a person acting under the color of state law. The Supreme Court has explained that "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (internal citations and quotation marks omitted). Here, it is clear (and undisputed) that Scarpati–Reilly's power over Perks derived from her position as Councilwoman on the Town Board, and specifically from her position as the Town Board's Liaison to the Oil Spill Response Board. Perks has thus satisfied this prerequisite for a valid Section 1983 action as well.

■ Moreover, it is clear that Scarpati–Reilly's alleged conduct is not shielded by qualified immunity. Government officials have qualified immunity from civil damages in Section 1983 actions when sued in their personal capacity, but only when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Scarpati–Reilly fails to meet this prerequisite. In 1998, when she allegedly

began to harass Perks, it was clearly established (1) that Perks had a constitutional right to be free of sexual discrimination; and (2) that sexual harassment violated that right. The Second Circuit had explicitly so ruled in 1994 when it issued the *Annis* decision, 36 F.3d at 254, and had implied as much even prior to that point. *See, e.g., Carrero v. New York Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989). Moreover, a reasonable person in Scarpati–Reilly's position would have known of these clearly established rights during the time period in question. *Shanes–Hernandez,* 99 F.3d at 402 (holding that, at least as of 1995, a reasonable person would have known of Section 1983 standards relating to sexual harassment); *cf. Blakeslee v. Ruffo,* 213 F.3d 625 (2d Cir.2000) (unpublished opinion) (stating that a reasonable person would not have known of standards between 1985 and 1987 because that period preceded the *Carerro* opinion). Accordingly, Scarpati–Reilly's motion for summary judgment on Perks' Section 1983 claim against her is denied.

■ The Court now moves to an assessment of Perks' Section 1983 claim against Huntington. The Supreme Court has held that a municipality cannot be held liable under Section 1983 on a theory of respondeat superior. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, a municipality can only be held liable if the unconstitutional conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers ... [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. 2018. When the claim is not that the municipality itself had an unconstitutional policy, but rather that the

unconstitutional behavior was committed by a state actor whose actions represent official policy, the crucial question is whether, under state law, that official possessed final policymaking authority in the particular area involved. *See St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Pembaur v. Cincinnati*, 475 U.S. 469, 481–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000).

■ Thus, to make out a Section 1983 claim against Huntington, Perks must either show (1) that Scarpati–Reilly's harassment of him resulted from a Town policy or (2) that Scarpati–Reilly herself had—pursuant to state law—final authority over the particular area involved (namely, personnel decisions). Although Perks argues that both routes of liability are present here, Pl.'s Opp'n [Docket No. 80] at 12–15, he fails to satisfy the prerequisites of either.

■ Perks argues that Scarpati–Reilly's harassment of him can be viewed as stemming from Town policy because, at the time the harassment took place, Huntington had not yet fully implemented a sexual harassment policy nor trained its employees about sexual harassment, despite its receipt of some prior complaints about sexual harassment.[18] Pl.'s Opp'n at 13–14. A municipality can indeed be held liable under Section 1983 for inadequate training, but only in very limited circumstances. As the Supreme Court explained in *Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." The Second Circuit has identified three requirements for showing that a municipality's inadequate training amounted to deliberate indifference: (1) the municipal policymaker must know "to a moral certainty" that employees will confront a given situation, for example, that police officers will be required to arrest fleeing felons; (2) the situation either presents employees with the type of difficult choices, for example, whether to use deadly force in apprehending a fleeing felon, that training or supervision would make less difficult, or employees have a history of mishandling the situation; and (3) the wrong choice by employees will frequently cause the deprivation of a citizen's constitutional rights. *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992).

Here, even construing the facts in the light most favorable to Perks, he has failed to satisfy this stringent test. There is no evidence that Huntington knew of Scarpati–Reilly's harassment of Perks, nor that it knew "to a moral certainty" that sexual harassment was prevalent among its employees, such that its failure to take action can be characterized as deliberate indifference. Accordingly, Perks cannot establish municipal liability under this theory.

■ Perks' argument that Huntington can be held liable under Section 1983 because of Scarpati–Reilly's position as a policymaker presents a somewhat closer question, but also ultimately fails. The Supreme Court has made clear that under this theory, "[m]unicipal liability attaches only where the decisionmaker possesses *final* authority to establish municipal poli-

---

**18.** Perks also alleges that Huntington and its policymakers can be viewed as acquiescing in Scarpati–Reilly's misconduct insofar as they were aware of the rumors about her affair with him. The relevance of this allegation is unclear, however, since Perks' own complaint characterizes the harassment as commencing only after he terminated the affair.

cy with respect to the action [in question]." *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292 (emphasis added). As the Court explained:

> [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policy maker, would give rise to municipal liability. Instead, *if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.* However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id.* at 483–84 n. 12, 106 S.Ct. 1292 (emphasis added). The Supreme Court has also stated that the issue of whether the decisionmaker possessed final policymaking authority is a question of state law. *Id.* at 483, 106 S.Ct. 1292; *Praprotnik*, 485 U.S. at 123, 108 S.Ct. 915; *Jett*, 491 U.S. at 737, 109 S.Ct. 2702.

Thus instructed by the Supreme Court, this Court looks to state law to determine whether Scarpati–Reilly exercised final policymaking authority with respect to personnel decisions over employees affiliated with Huntington's Oil Response Board. An examination of New York law indicates that such final authority rests not with any one council member individually, but rather with the Town Board as a whole. *See* N.Y. Town Law § 20(1)(a) ("Every town ... shall have ... as many ... employees *as the town board may determine necessary* for the proper conduct of affairs of the town. The supervisor, town councilmen, town clerk, town justices, town superintendent of highways and receiver of taxes and assessments in every such town shall be elective. *All other officers and employees in such a town shall be appointed by the town board,* except as otherwise provided by law.") (emphasis added). Accordingly, only the Town Board's decisions can provide a basis for Town liability, just as the Supreme Court explained in *Pembaur*.

Perks can only circumvent this limitation by showing that the "Board delegated its power to establish final employment policy to [Scarpati–Reilly,]" *Pembaur*, 475 U.S. at 483–84 n. 12, 106 S.Ct. 1292, and this he has failed to do. Construing the facts most favorably to Perks, he has indeed shown that Scarpati–Reilly was able, through her roles as Councilwoman and particularly as Liaison to the Oil Spill Response Board, to maneuver herself into the position of his de facto supervisor and thereby influence his job conditions. He has not shown, however, as he must, that the Town Board actually delegated its power over final employment policy to Scarpati–Reilly. *See Jeffes*, 208 F.3d at 57–58 ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."). Accordingly, Huntington cannot be held liable under Section 1983, and its motion for summary judgment on this count is granted.

**4. Perks' Defamation claim arising from Scarpati–Reilly's February 28, 1999 Police Report**

 Perks' next allegation is that Scarpati–Reilly defamed him on the night

of February 28, 1999, when (after the altercation at the Cold Spring Harbor Mobil station) she filed a written police report stating that he had struck her. Under New York law, a libel plaintiff must prove five elements: "(1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) defendant's fault, varying in degree depending on whether plaintiff is a private or public party; (4) falsity of the defamatory statement; and (5) injury to plaintiff." *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir.2001). In addition, New York recognizes a qualified privilege for statements made to the police about another individual's suspected crimes. *Toker v. Pollak*, 44 N.Y.2d 211, 220, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978). To overcome this qualified privilege, the plaintiff must challenge the defendant's good faith and allege that she acted either with actual malice (i.e., she made a defamatory statement with the knowledge that it was false or with reckless disregard as to whether it was false), or with common law malice (i.e., she made the defamatory statement solely with the desire to injure the plaintiff). *See, e.g., Liberman v. Gelstein*, 80 N.Y.2d 429, 437–39, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992); *Present v. Avon Products*, 253 A.D.2d 183, 188–89, 687 N.Y.S.2d 330 (1st Dep't 1999).

Scarpati–Reilly previously brought a motion to dismiss this count on grounds of this qualified privilege. Judge Mishler denied this motion, concluding that Perks "has adequately alleged that [Scarpati–Reilly] filed the police report knowing that the statements contained therein were false and that she did so solely with a desire to injure Plaintiff." *Perks*, 96 F.Supp.2d at 230. Scarpati–Reilly has not re-raised this argument in her motion for summary judgment on this count. Instead, she has raised two other grounds for summary judgment, both of which lack merit.

First, Scarpati–Reilly argues that Perks has failed to enumerate his damages and, thus, has failed to meet the "injury" element of a libel action under New York law. Scarpati–Reilly's Mem. at 18. As the Second Circuit explained in *Meloff*, however, a plaintiff's "compensable injury is presumed if the defamatory statement falls within a category of libel *per se*." 240 F.3d at 145. A written statement is libelous per se if "it tends to expose [a person] to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) (internal citations omitted). The Second Circuit has explicitly held that under New York law, "a written statement that charges a person with the commission of a crime ... is libel *per se*." *Meloff*, 240 F.3d at 145 (internal citations and quotation marks omitted).

Accordingly, Perks' allegation that Scarpati–Reilly filed a written police report that falsely accused him of harassment qualifies as libel *per se*. Scarpati–Reilly's citation of *Liberman*, 80 N.Y.2d at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344, a slander case in which the defendant's oral statement that the plaintiff had threatened to kill him and his family was held not to be slander per se because "[h]arassment is a relatively minor offense," is inapposite. Perks' allegations arise in the context of libel rather than slander. *See, e.g., Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 396–99 (S.D.N.Y.1998) (describing the distinctions between libel per se and slander per se, and noting that although "[i]n the area of slander *per se*, the law is quite restrictive in terms of which crimes support a valid claim," research has not revealed "any cases which support importing this restrictive requirement from slander

*per se* into libel *per se* "); *Protic v. Dengler,* 46 F.Supp.2d 277, 280 n. 11 (S.D.N.Y. 1999) ("The characteristics that make a written statement libelous *per se,* confusingly enough, are not the same characteristics that make a verbal statement slanderous *per se.*"). Thus, Scarpati–Reilly's argument fails. Perks' lack of itemized special damages does not doom his libel claim against Scarpati–Reilly.

■ Scarpati–Reilly also argues that Perks is a limited purpose public figure upon whom heightened standards apply for recovery in defamation actions. Scarpati–Reilly's Mem. at 16–19. In making this argument, however, Scarpati–Reilly cites only the actions that Perks took well *after* Scarpati–Reilly filed the police report about him on February 28, 1999 (namely, Perks' filing of this lawsuit and speaking to the press about it). *Id.* at 13–14. Accordingly, while this argument must be considered in the context of Perks' defamation claim in regard to Scarpati–Reilly's October 27, 1999 open letter, *see infra* pp. 49–51, it is inapplicable to Perks' claim regarding the February 28, 1999 police report. There is simply no support for the contention that Perks was a limited-purpose public figure on February 28, 1999. Accordingly, both of Scarpati–Reilly's arguments for summary judgment on this defamation claim lack merit, and her motion for summary judgment as to this claim is denied.

■ The Court now considers whether Huntington can be held vicariously liable on this defamation claim, as Perks alleges in his sixth cause of action. Under New York law, an employer can be held vicariously liable for a defamatory statement made by one of its employees, but only if the employee made the statement in the course of performance of her duties. *See, e.g., Rausman v. Baugh,* 248 A.D.2d 8, 10, 682 N.Y.S.2d 42 (2d Dep't 1998); *Seymour v. New York State Electric &* *Gas,* 215 A.D.2d 971, 973, 627 N.Y.S.2d 466 (3d Dep't 1995); *Murray v. Watervliet,* 130 A.D.2d 830, 831, 515 N.Y.S.2d 150 (3d Dep't 1987); *see generally Riviello v. Waldron,* 47 N.Y.2d 297, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979) (discussing the principles of respondeat superior in the employer/employee context). Thus, the key question is—as both parties recognize—whether Scarpati–Reilly was acting within the scope of her employment as Councilwoman when she went to the police station, accused Perks of slapping her, and filed the incident report charging him with harassment.

As the *Rausman* court noted, "[t]here is no single mechanical test to determine whether at a particular moment an employee is engaged in the employer's business." 248 A.D.2d at 10, 682 N.Y.S.2d 42. The *Rausman* court did, however, identify the following factors that the case law has indicated are particularly important: (1) whether the employee's act fell within the discretion and control of the employer; (2) whether the employee acted under the express or implied authority of the employer; (3) whether the employee's act was in furtherance of the employer's interests; (4) whether the employee's acts were in the "discharge of duty" to the employer; (5) whether the act was in execution of the employer's orders or part of the work assigned by the employer; and (6) whether the acts were "so closely connected" with what the employee was hired to do, and "so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of employment." *Id.* at 10–11, 682 N.Y.S.2d 42. (internal citations omitted). The Court notes this list as instructive and also notes the general principle that "there is no respondeat superior liability for 'torts committed for personal motives unrelated to the furtherance

of the employer's business.'" *Murray,* 130 A.D.2d at 831, 515 N.Y.S.2d 150.

With these factors in mind, the Court concludes that even construing the facts in the light most favorable to Perks, no reasonable jury could find that Scarpati–Reilly was acting within the scope of her employment when she filed the police report charging Perks with harassment on the night in question. Scarpati–Reilly's duties as a Councilwoman did not require her to file police reports against Town employees. Her position did not endow her with any authority—beyond that possessed by the general public—to file criminal charges against Town employees. Huntington did not instruct or direct her to engage in such behavior and could not have foreseen—given Perks' admitted inaction in telling anyone about Scarpati–Reilly's treatment of him prior to February 28, 1999—that she would do so. Nor did Scarpati–Reilly's filing of the police report yield any benefit for Huntington or further its interests. Thus, all of the factors weigh against a conclusion that Scarpati–Reilly was acting in the course of her employment when she filed the police report. This was also the case in *Rausman,* where the court explained:

> The grocery clerk who drops the lettuce leaves on which a customer slips was not paid to drop the lettuce, but was indeed paid to put it on the shelf, just as the bus driver who negligently causes an accident was not paid to injure anyone but was indeed paid to drive. In contrast, Baugh, as a social worker, was not hired for the purpose of making allegations of alleged sexual harassment, let alone defamatory ones, and it was certainly not a part of her job description.

*Rausman,* 248 A.D.2d at 13, 682 N.Y.S.2d 42.

Scarpati–Reilly's identification of herself as a Councilwoman at the police station does not diminish this conclusion. Scarpa-

ti–Reilly's decision to identify herself as such to the police officer does not automatically mean that she was acting within the scope of her employment at that time. If Scarpati–Reilly's personal invocation of the term "Councilwoman" were the standard for determining Huntington's vicarious liability, that liability would be potentially limitless. In her deposition, Scarpati–Reilly stated:

> I'm always Councilwoman for the Town of Huntington. I'm an elected official twenty-four hours a day ... Everything that I do I'm acting as Councilwoman for the Town of Huntington ... I represent the town in my elected capacity, whether I'm here or if I'm in Arizona, wherever I am I'm an elected official of this town and I represent the town and the people that are here.

Scarpati–Reilly 4/5/01 Dep. at 61–62.

This, clearly, cannot serve as the standard for determining when to place vicarious liability upon Huntington for Scarpati–Reilly's actions. Rather, the Court must look objectively at whether a given action taken by Scarpati–Reilly could arguably be found by a jury to fall within the scope of Scarpati–Reilly's employment as Councilwoman. For the reasons set forth above, the Court concludes that no reasonable jury could find that filing the police report against Perks fell within the scope of Scarpati–Reilly's employment. The facts—even construed in the light most favorable to Perks—yield only one conclusion: that whether or not Scarpati–Reilly was acting within the scope of her employment when she initially drove to the Mobil station to see Perks on the night in question, she subsequently filed the police report against him on the basis of personal motives unrelated to the furtherance of Huntington's business. Accordingly, Huntington's motion for summary judgment on this claim is granted.

### 5. Perks' Defamation Claims Arising From Scarpati–Reilly's October 27, 1999 Open Letter

 Scarpati–Reilly next moves for summary judgment on Perks' defamation claims that arise from her publication of the October 27, 1999 open letter in *Suffolk Life*. As noted above, in this letter, Scarpati–Reilly stated (1) that Perks was "known for verbal abuse [and] turned to violence against a woman"; (2) that Perks had struck her on February 28, 1999; and (3) that he had stolen a receipt from her glove compartment in order to make a false accusation that she had spent an adulterous weekend with him at an upstate resort, when in fact she had spent the weekend with her husband. Here, Scarpati–Reilly's motion centers on her argument that Perks is a limited purpose public figure upon whom more stringent requirements apply for recovery in defamation actions.

As explained by the Second Circuit, a limited purpose public figure is someone who has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 617 (2d Cir.1988), *citing Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir.1984):

 A plaintiff who is a limited purpose public figure can recover in a defamation action only by showing with clear and convincing evidence that the de-

fendant acted with actual malice, that is, that the defendant knew that the statement was false or made the statement with reckless disregard as to whether it was false. *Id.* at 621. Moreover, such a plaintiff has the burden of proving falsity, "although, as a practical matter, evidence sufficient to establish actual malice will generally encompass evidence of falsity." *Id.*

The Court agrees that Perks was a limited purpose public figure—in regard to this particular controversy—by the time that Scarpati–Reilly published her open letter about his lawsuit. Perks himself stated in his deposition that he had participated in more than one press conference related to this lawsuit (at least one of which was called by his own attorney), and that he had agreed to be interviewed by several reporters who were writing newspaper articles about the dispute. Perks 3/9/01 Dep. at 327–333.[19] He explained that he took these actions precisely in order to present his "side of the story." *Id.* at 333. The Court therefore rules that Perks, through his own voluntary and repeated contact with the media, rendered himself a public figure for the purpose of commenting on his lawsuit against Scarpati–Reilly and Huntington. *See, e.g., Contemporary Mission*, 842 F.2d at 618 (basing a determination that plaintiffs were limited purpose public figures in part on the fact that they "openly availed themselves of the media, issuing press releases, making public statements and addressing 'open letters' "); *Liu v. New York News, Inc.*, 183 A.D.2d 443, 443–44, 583 N.Y.S.2d 391 (1st Dep't 1992) (basing a determination that plaintiff was a limited purpose public figure on the fact that he had held a press conference to present his opinion on the incident in question, and was thereaf-

---

**19.** It is not entirely clear from the record when these events occurred, but Perks conceded that they might have taken place prior to Scarpati–Reilly's publication of the open letter. *Id.* at 327, 334.

ter the subject of a magazine cover story as well as other press articles).

■■■■■ Accordingly, "the appropriate summary judgment question [is] whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson,* 477 U.S. at 255–56, 106 S.Ct. 2505. Scarpati–Reilly argues that a reasonable jury could not find by clear and convincing evidence that she knew of—or recklessly disregarded—the falsehood of her statements about Perks, because those statements were in fact true. Scarpati–Reilly's Rep. Mem. at 10. As the Second Circuit explained in *Guccione v. Hustler Magazine, Inc.,* "Under New York law … it is fundamental that truth is an absolute, unqualified defense to a civil defamation action, and 'substantial truth' suffices to defeat a charge of libel." 800 F.2d 298, 301 (internal citations and

quotation marks omitted). Thus, unless the evidence in the record could permit a reasonable jury to find by clear and convincing evidence that Scarpati–Reilly lied or recklessly disregarded the truth in her open letter—a conclusion that necessarily encompasses a finding that statements in her open letter were untrue—Scarpati–Reilly's motion for summary judgment must be granted.

Unfortunately for Scarpati–Reilly, the Court rules that a reasonable jury could make such a finding in regard to her open letter's second and third allegedly defamatory statements about Perks (that he struck her and stole a receipt from her glove compartment).[20] Evaluating whether these statements were true (and, relatedly, whether Scarpati–Reilly knew that they were false when she made them) essentially comes down to a credibility determination between Scarpati–Reilly and Perks.[21] The Supreme Court explained in *Anderson* that:

20. The Court agrees that a reasonable jury could not find that Scarpati–Reilly behaved with actual malice when she stated in her open letter that Perks was known for verbal abuse and turned to violence against a woman, given Scarpati–Reilly's factual support for this allegation. As exhibits to her motion for summary judgment, Scarpati–Reilly has produced an Amended Verified Answer and Counterclaim for divorce filed by Perks' estranged wife, Laura Perks, in 1997, as well as a Verified Petition for an Order of Protection against William Perks filed by Laura Perks in 1998. Exs. I, J, and K to Scarpati–Reilly's Mot. for Summ. J. In her Answer and Counterclaim for Divorce, Laura Perks stated that "Plaintiff [William Perks] has frequently exhibited violent tendencies toward Defendant [Laura Perks], including threatening Defendant with talk of guns he keeps in the house, grabbing Defendant around her throat on another occasion, and engaged in many years of verbal abuse both in and out of the presence of the children." Ex. I, ¶ 18(f). In her Petition for an Order of Protection, Laura Perks reiterated this accusation and also stated that "[o]n or about 7/21/98 … [William Perks] threatened the Petr. [Laura Perks] in front of

the children and shoved the Petr." Ex. J, ¶ 3. The Order of Protection was subsequently granted by the Suffolk Family court. Ex. K.

Scarpati–Reilly asserts that she knew of these allegations, *see* Scarpati–Reilly Aff. [Docket No. 89], ¶ 12, and Perks apparently does not dispute Scarpati–Reilly's awareness of them. *See* Pl.'s Am. 56.1 Stmt., ¶ 11 (stating that there is no "evidence that supports a finding that those allegations [of abuse] were generally known throughout the community or even known by anyone other than the plaintiff, his ex-wife, [and] Scarpati–Reilly.") Given this factual support, no reasonable jury could find by clear and convincing evidence that Scarpati–Reilly knew (or recklessly disregarded) that her statement about Perks' violent tendencies toward women was false when she published it.

21. The credibility of Scarpati–Reilly's husband, Steven Reilly ("Reilly"), is also implicated by Scarpati–Reilly's allegation that Perks stole from her glove compartment a receipt that her husband had placed there, in that Reilly has filed an affidavit in support of Scarpati–Reilly's claim. Reilly Aff. [Docket No. 90], ¶¶ 3–4.

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

With that guidance in mind, the Court rules that summary judgment is not warranted here. The evidence presented in the opposing affidavits is *not* "of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id.* at 254, 106 S.Ct. 2505. On the contrary, Perks' detailed deposition testimony provides an ample basis upon which a jury could rest such a finding, particularly when taken in conjunction with Scarpati–Reilly's own admission that she initially lied to the press when she denied having filed a police report against Perks and accused someone else of having done so. *See supra* p. 1152. As noted above, the Independent Factfinder hired by the Town concluded that, although the facts relating to the altercation between Perks and Scarpati–Reilly "may never be susceptible of absolute determination," there is "substantial evidence ... that casts serious doubts on Ms. Scarpati–Reilly's claims" and that Scarpati–Reilly's "actions, in the aggregate, demonstrate a calculated and persistent disregard for the truth." Factfinder's Report at 1. Accordingly, the Court rules that a jury could reasonably find for either party on this point and that summary judgment is therefore inappropriate. Scarpati–Reilly's motion for summary judgment on the

defamation claims arising from her October 27, 1999 open letter (Counts 11 and 12) is thus denied.

 The Court now considers whether Huntington can be held liable for defamation as a result of Scarpati–Reilly's open letter. There are two potential sources for such liability: (1) Huntington may itself have caused the open letter to be published, as Perks alleges in his Amended Complaint; or (2) Huntington may be vicariously liable for Scarpati–Reilly's action of publishing the letter.

In regard to the first route to liability, Perks has not created a triable issue of material fact. Perks conceded in his deposition that he did not have any evidence establishing that the Town Board itself was involved in the publication of the open letter. Perks 11/20/00 Dep. [Docket No. 60] at 241–42. Indeed, no such evidence exists. Even the evidence most favorable to Perks—that DeGregorio read the open letter shortly before it was published, without offering any comments or proposing alterations—is insufficient to support the conclusion that a reasonable jury could find that Huntington caused the letter to be published. There is simply no evidence that the Town Board, as an entity, participated with Scarpati–Reilly in drafting the letter, approved its publication, or gave her permission to place the Town seal and masthead on top of the letter. This conclusion is further supported by the fact that the bulk of the letter is devoted to an attack on Scarpati–Reilly's fellow Town Board Members, as will be discussed *infra.*

Indeed, in Perks' Opposition to Huntington's motion for summary judgment on this claim, he seems to recognize that the second route to liability—respondeat superior—is the most significant issue. Perks himself describes the question as the same as that raised by his claim against Hunt-

ington in relation to Scarpati–Reilly's filing of the police report against him: namely, whether Scarpati–Reilly was acting within the scope of her employment when she made the allegedly defamatory statements. Pl.'s Opp'n at 22. The Court agrees that this is the critical question in determining whether Huntington's motion for summary judgment should be granted.

In arguing that Scarpati–Reilly was indeed acting within the scope of her employment, Perks points out that Scarpati–Reilly issued the letter under Huntington's masthead and seal and signed it as Councilwoman for Huntington and that Huntington never issued a retraction or otherwise distanced itself from the letter. Pl.'s Opp'n at 22. He concludes that "[Huntington's] characterization of the letter as Scarpati–Reilly's personal response is a factual conclusion that this court is precluded from drawing based on the evidence before it." *Id.*

This Court disagrees. Although the evidence cited by Perks carries a certain degree of weight, Perks neglects to mention that the letter also included a disclaimer (albeit one in small print) that it was not paid for at taxpayer expense, but rather by Scarpati–Reilly and her family. More importantly, an examination of the letter itself conclusively establishes that, just as when Scarpati–Reilly filed the police report, here she was acting entirely in furtherance of her own personal motives. As noted above, a significant portion of the letter attacks the Town Board itself, thus undercutting any interpretation that Scarpati–Reilly published it under Huntington's express or implied authority. For example, one portion of the letter reads as follows:

> Steve Israel [a fellow Board member] has accused me of wasting tax money because I had to sue the Town to get documents necessary to defend both myself and the taxpayers. He doesn't believe I have rights under Freedom of Information Laws, nor a right to defend myself and your pocketbooks against the unsupported conclusions of his fact finder. The Town Board forwarded that report to the District Attorney, Attorney General and Town's Ethics Board, and it serves as the basis of Mr. Perks' lawsuit against the Town and me. Mr. Israel and his Town Board majority, in their eagerness to politically and professionally harm my good name, has compromised the Town in this lawsuit.

Ex. M to Scarpati–Reilly Mot. for Summ. J.

Because the Court rules that a reasonable jury could find neither that the Town Board participated directly in Scarpati–Reilly's publication of the open letter, nor that Scarpati–Reilly published the letter while acting other than pursuant to her own personal motives, the Court grants Huntington's motion for summary judgment on Counts 11 and 12 of Perks' claim against it. Pursuant to this dismissal, the Court also grants Scarpati–Reilly's motion for summary judgment on Huntington's cross-claim against her for indemnification and contribution should it be found liable on Perks' defamation claims arising from the open letter.

### 6. Perks' Section 1985 claim

[■■] Perks' Amended Complaint charged both Scarpati–Reilly and Huntington with violating 42 U.S.C. § 1985(3). Section 1985 provides, in relevant part, that:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such con-

spiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages . . . against any one or more of the conspirators.

42 U.S.C. § 1985(3).

As noted above, Judge Mishler previously granted Scarpati–Reilly's motion to dismiss this claim. Judge Mishler explained that under Second Circuit law, a "legally sufficient § 1985(3) complaint must aver a conspiracy between two or more persons intended to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the law . . . ." *Perks*, 96 F.Supp.2d at 231 (citing *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66, 70 (2d Cir. 1976)) (internal quotation marks omitted). Judge Mishler noted that Perks had failed to name any individual other than Scarpati–Reilly in his complaint. *Perks*, 96 F.Supp.2d at 232. Judge Mishler then proceeded to analyze the claim as though Perks had named DeGregorio and Matthews as co-conspirators in his complaint, given that they had been named in the Factfinder's Report, which was attached to the complaint. *Id.* Judge Mishler concluded that there was no support for the allegation that DeGregorio or Matthews had conspired with Scarpati–Reilly to deprive Perks of the equal protection of the laws, or of equal privileges and immunities under the law, and, therefore, he dismissed Perks' Section 1985 claim against *Scarpati–Reilly*. *Id.* at 232–33. Huntington here moves for summary judgment on the basis of Judge Mishler's opinion.

In opposing Huntington's motion for summary judgment on this claim, Perks asks this Court to revisit the question whether DeGregorio could be found a co-conspirator under Section 1985. Perks ar-

gues that the evidence could "support an inference by a jury that DeGregorio agreed to help Scarpati–Reilly pursue criminal charges in order to retaliate against, and preclude, his sexual harassment claims." Perks Opp'n at 20. This Court, however, agrees entirely with the rationale underlying Judge Mishler's dismissal of this claim against Scarpati–Reilly—that "[w]hile DeGregorio did discuss the matter with [Scarpati–Reilly] and offer to accompany her to the District Attorney as she pursued criminal charges against [Perks], there is no support for the allegation that he did so with the intent to further [Scarpati–Reilly's] allegedly illegal motives," *Perks*, 96 F.Supp.2d at 232. Moreover, none of the evidence adduced by Perks in his opposition to summary judgment undermines this conclusion. Accordingly, Huntington's motion for summary judgment on this claim is granted.

### III. CONCLUSION

For the foregoing reasons, Huntington's motion for summary judgment [Docket No. 66] is DENIED with respect to Perks' First, Second, and Seventh claims against it, and GRANTED with respect to Perks' other claims against it (claims Three, Six, Eight, Nine, Ten, Eleven, and Twelve). Scarpati–Reilly's motion for summary judgment [Docket No. 87] is DENIED with respect to Perks' remaining claims against her (claims Two, Three, Four, Eight, Ten, Eleven, and Twelve), but GRANTED with respect to Huntington's cross-claim against her. Thus, Perks' Title VII and NYHRL claims against Huntington will proceed to trial, as will his NYHRL, Section 1983, and multiple defamation claims against Scarpati–Reilly.

SO ORDERED.