Michael D. FRANK, Plaintiff,

v.

LAWRENCE UNION FREE SCHOOL DISTRICT; et al., Defendants.

No. 06–CV–2200 (JS)(MLO).

United States District Court, E.D. New York.

Feb. 22, 2010.

Andrew Scott Goodstadt, Esq., Scott Browning Gilly, Esq., Thompson, Wigdor & Gilly LLP, New York, NY, for Plaintiff.

Lewis R. Silverman, Esq., Julie Ann Rivera, Esq., Rutherford & Christie, LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

SEYBERT, District Judge:

In 2003 and 2004, the Lawrence Union Free School District denied Plaintiff Michael D. Frank tenure, then fired him. Mr. Frank responded by commencing suit asserting discrimination, retaliation, and failure to make reasonable accommodation claims under the Americans with Disabilities Act of 1990 ("ADA"), the Rehabilitation Act, and the New York State Human Rights Law ("NYSHRL"). Currently before the Court is Defendants' summary judgment motion, and Plaintiff's motion for sanctions.

## BACKGROUND

In 2000, Lawrence hired Mr. Frank as a junior high school mathematics teacher, on a probationary basis. *Id.* ¶¶ 3, 12. Mr. Frank never needed any assistance to perform his teaching duties. *Id.* ¶ 6.

During the 2000–2001 school year, Dr. Roseanne Melucci ("Dr. Melucci"), Carol Lynch, and Dr. Mark Kavarsky ("Dr. Kavarsky") observed Mr. Frank's lessons. *Id.* ¶ 8. Dr. Melucci was Mr. Frank's immediate supervisor for that school year. *Id.* ¶ 12. She observed Mr. Frank on October 18, 2000, November 9, 2000, November 29, 2000, April 30, 2001, and May 1, 2001. *Id.* ¶ 9. Dr. Melucci's October 18 report noted that Mr. Frank's lesson "contained components of the principles of learning," and stated that Mr. Frank "used motivation" and "maintained appropriate classroom management." Pl.'s Ex. F. But Dr. Melucci also stated that Mr. Frank's lesson was "not an effective co-teaching special education lesson." *Id.* Mr. Frank did not respond to her report. Def. Stmt. 11.

At the end of each school year, Lawrence teachers receive an annual appraisal. Kavarsky Tr. 112. These annual appraisals are more important than individual lesson observations in evaluating probationary teachers and making tenure recommendations. Kavarsky Tr. 113. If a teacher did not meet his goals or had issues that would negatively impact upon receiving tenure, the annual appraisals would reflect these problems. Kavarsky Tr. 114.

Notwithstanding Dr. Melucci's October 18 lesson report, Mr. Frank received a very positive annual appraisal for the 2000–2001 school year. Pl. Ex. GG. This appraisal reported that Mr. Frank "demonstrates knowledge of his subject matter, establishes and achieves lesson and unit objectives and provides for active student participation." *Id.* In addition, Mr. Frank "achieved a positive tone and a feeling of mutual respect where students genuinely feel that he cares for them and they in turn respond positively for him." *Id.* The appraisal also commended Mr. Frank for the "meticulous care" he takes in performing aspects of his job, his "excellent" attendance record, his openness to "supervisor suggestions," and his consistent "professional manner and appearance." *Id.* The appraisal summarized its findings by stating that Mr. Frank "had a successful experience as a first year teacher." *Id.*

Dr. Melucci also observed Mr. Frank during the 2001–2002 school year. Dr. Melucci's November 14, 2001 report noted that Mr. Frank's lesson "met its objective" and stated that Mr. Frank's position "seem[ed] to be an appropriate placement" for him. Def. Ex. M. But the same report also stated that Mr. Frank did not permit students to "come to the board and demonstrate their learning" and noted that Mr. Frank reduced the number of questions he intended to use because he ran out of time. Def. Ex. M. Dr. Melucci recommended that Mr. Frank improve his lesson timing. *Id.* Mr. Frank did not respond to this report. Def. Stmt. 18.

Dr. Melucci's December 6, 2001 observation report stated that Mr. Frank utilized certain positive teaching techniques, such as modeling, checking for the students' understanding, and providing feedback. Def. Ex. N. But Dr. Melucci recommended that Mr. Frank's lessons should "contain questions that go beyond knowledge." *Id.* Additionally, Dr. Melucci stated that Mr. Frank's lesson did not meet its objective because of its timing. *Id.* According to Dr. Melucci, Mr. Frank planned a lesson "that was probably more appropriate for two periods of instruction." *Id.* Mr. Frank informed his students that they should use a review sheet to practice all twelve of a worksheet's sections. *Id.* But Mr. Frank did not model all twelve of these sections in class. *Id.* And Mr. Frank then tested the students on all twelve sections. *Id.* Mr. Frank did not respond to this report.

Dr. Melucci's January 25, 2002 report stated that Mr. Frank's lesson lacked closure, but praised the lesson as a "creative way to teach." Ex. N. Dr. Melucci's March 11, 2002 observation report stated that Mr. Frank had "wonderful ideas that [were] evident in [his] planning" and that Mr. Frank had a positive relationship with his students that made his "classroom a place where students enjoy learning." Ex. P. But Dr. Melucci again recommended that Mr. Frank include closure in his lessons and stated that timing continued to be an issue.

At the close of the 2001–2002 school year, Mr. Frank again received a positive annual appraisal. Pl. Ex. HH. The appraisal reported that Mr. Frank's "knowledge of the curriculum is very good," and that "[t]he tone of [his] classroom is very conducive to learning." *Id.* The appraisal noted that Mr. Frank fell behind in submitting paperwork at one point, but that "this was no longer an issue." *Id.* The appraisal concluded by noting that Mr. Frank "worked hard to meet his collaborative goals," and "has the potential to be a leader in the [math] department." *Id.*

Mr. Frank was eligible for tenure during the 2002–2003 school year. Def. Stmt. 30. During this school year, Dr. Kavarsky supervised him. Def. Stmt. 29. Dr. Kavarsky observed Mr. Frank's lesson on October 2, 2002, December 18, 2002, and March 4, 2003. *Id.* at ¶ 32. In his December 18, 2002 observation report, Dr. Kavarsky noted that Mr. Frank's lesson design "incorporated the key elements of effective instruction," but recommended that he use "graphic organizers" in his lessons. Ex. S.

During this time, Michelle Lineal was Lawrence's Assistant Superintendent of Curriculum and Instruction. In January or February of 2003, Ms. Lineal observed Mr. Frank's teaching, to determine whether to recommend him for tenure. After observing his lesson, Ms. Lineal informally spoke with Mr. Frank to provide her comments. Sometime later, she and Dr. Kavarsky conducted a formal conference with Mr. Frank. Def. Stmt. 39–42. At this conference, Mr. Frank recalls that Ms. Lineal told him he was "so big and sloppy." Pl.'s Dep. 51:11.

Dr. Kavarsky does not recall Ms. Lineal using that phrase. Kavarksy Tr. at 72. But Dr. Kavarsky does recall Ms. Lineal making remarks about Mr. Frank's "attire," indicating that she said something like "for a big man, that bowling shirt doesn't look good." *Id.* Dr. Kavarsky remarked that this statement "somewhat caught my breath." *Id.* He understood her statement to mean that "holistically she did not like the way he appeared in the classroom." *Id.* at 73. Dr. Kavarsky also recalled that Ms. Lineal asked him to "work with [Mr. Frank] to get him better dressed." *Id.* at 75. Dr. Kavarsky had no problems with Mr. Frank's attire, no one besides Ms. Lineal brought any such problems to his attention, and he never spoke with Mr. Frank concerning Ms. Lineal's remarks. *Id.* at 75–76.

In the spring of 2003, Ms. Lineal met with Superintendent Dr. Mark Rosenbaum and Dr. Kavarsky to discuss, among other things, Mr. Frank's tenure application. Kavarsky Tr. 88. Dr. Kavarsky believed that Mr. Frank satisfied his objectives and goals for all three years he had taught, and strongly supported awarding him tenure. Kavarsky Tr. 114–15. Ms. Lineal disagreed. She indicated that she would not approve Mr. Frank's tenure because "he had not met the standards." Kavarsky Tr. 89. Dr. Kavarsky then asked Ms. Lineal to "share with me any documentation" she had prepared to support her view. *Id.* But "[t]here was nothing forthcoming," as Ms. Lineal "did not choose to share any notes." *Id.* at 90. Ms. Lineal

then demanded Mr. Frank's "immediate dismissal." *Id.* Dr. Kavarsky responded by "attempting to strike a compromise," and asked Dr. Rosenbaum if "he would consider a fourth year for Mr. Frank." *Id.* Dr. Rosenbaum agreed, and they decided to offer Mr. Frank a fourth year. *Id.* at 91. Mr. Frank, in turn, was advised to request a fourth year, which he did. Pl. Stmt. ¶ 156. Mr. Frank then entered into a written agreement memorializing the terms of the fourth probationary year. Pl. Stmt. ¶ 157; Def. Ex. U.

Despite not receiving tenure, Mr. Frank did not receive a negative annual appraisal for the 2002–2003 school year. Instead, his appraisal, among other things, indicated that Mr. Frank "worked hard" to meet his yearly goals, "developed creative and innovative ideas to make his classroom a place where students enjoy learning," and had "very good" "knowledge of the curriculum." Pl. Ex. II.

The 2003–2004 school year became Mr. Frank's fourth probationary year. Originally, Dr. Kavarsky was supposed to remain Mr. Frank's immediate supervisor. Kavarsky Tr. 92. But, at the beginning of Mr. Frank's fourth year, Mr. Akst replaced him. *Id.* Dr. Kavarsky did not believe there was "any professional rationale in terms of appraisal or staff development" for replacing him as Mr. Frank's supervisor, especially because Mr. Akst was "not a math licensed supervisor" and had never supervised math teachers before. Kavarsky Tr. 125. Dr. Kavasrky commented that one might "conjecture" that Mr. Akst replaced him because "he was up for tenure that year and so could be vulnerable to [Ms. Lineal's] persuasion." Kavarksy Tr. 124–25.

On October 16, 2003, Mr. Akst observed Mr. Frank's lesson. In his observation report, Mr. Akst noted that Mr. Frank's "time on task was good" and that Mr. Frank created a "non-intimidating atmosphere" where students felt "comfortable to focus and participate in the lesson." Def. Ex. V. However, Mr. Akst reported that the "timing of the lesson needed improvement" and that "it was difficult to check for understanding, as only a few students were participants in the lesson." Mr. Akst found the lesson "satisfactory." *Id.*

On December 5, 2003, Dr. Kavarsky observed Mr. Frank's lesson. In his subsequent report, Dr. Kavarsky noted that "time management was a factor, again" and stated that Mr. Frank "has repeatedly been cited for his inconsistency in time management." Def. Ex. W.

Karen Lazare observed Mr. Frank's December 12, 2003 lesson. Ms. Lazare's classroom observation report commended Mr. Frank for "planning a good lesson." Def. Ex. X. But Ms. Lazare noted that "timing still remained an issue." Ms. Lazare indicated that Mr. Frank did not leave sufficient time for guided practice or to check the students' understanding. *Id.* As a result, the "guided practice was rushed and fell short of its intended goal, and it was not clear whether the class has acquired an understanding of the concepts ... identified in the day's objective." *Id.*

Dr. Kavarsky discussed Mr. Frank's situation with Mr. Akst several times throughout the year. "Every time" Dr. Kavarsky discussed Mr. Frank with Mr. Akst, Mr. Akst reported that he intended to recommend Mr. Frank for tenure, including when Dr. Kavarsky spoke with Mr. Akst after Mr. Akst's observations. Kavarsky Tr. 126. Then, after a meeting with Ms. Lineal, Mr. Akst "emphatically" told Dr. Kavarsky that "Ms. Lineal put the kibosh on [Mr. Frank's] tenure and he would not be receiving any tenure." Kavarsky Tr. 126. Dr. Kavarsky "was shocked and appalled" when he learned

this, especially because "Ms. Lineal was not part of any observation process that year nor part of any conversations regarding Mr. Frank." Kavarsky Tr. 127.

In February 2004, Mr. Akst informed Mr. Frank that he would not receive tenure. Frank Tr. 73. Mr. Frank responded by informing him that he intended to seek legal counsel. Frank Tr. 88.

On March 3, 2004, Mr. Akst conducted an unannounced "drop in" observation of Mr. Frank's lesson. Pl. Stmt. ¶ 204. Mr. Akst considered the lesson "satisfactory." Def. Ex. Y. But Mr. Akst noted that the lesson was "teacher dominated" and concluded that the lesson did not meet its objective. *Id.*

On March 29, 2004, Mr. Frank's attorney, Scott B. Gilly, wrote Dr. Fitzsimons and Lawrence Board of Education President Frank Parise a letter complaining about Ms. Lineal's allegedly discriminatory conduct. Pl. Ex. CC.

In the Spring of 2004, Dr. Fitzsimons observed Mr. Frank's teaching performance. Def. Stmt. ¶ 71. Thereafter, Dr. Fitzsimons met with Dr. Kavarsky, Mr. Akst, and Ms. Lineal to discuss Mr. Frank's prospective tenure. Dr. Kavarsky believed that Mr. Frank satisfied his objectives and goals for his fourth year of teaching. Kavarsky Tr. 115. Ms. Lineal and Mr. Akst opposed granting Mr. Frank tenure. In opposing Mr. Frank's tenure, Dr. Kavarsky believes that Mr. Akst "was being more politically correct or tenure sensitive correct," noting that—in prior conversations—"we both agreed that Mr. Frank had the qualities to be a good math teacher in Lawrence." Kavarsky Tr. 128. Ms. Lineal took the strongest position against awarding Mr. Frank tenure. Dr. Kavarsky responded to Ms. Lineal's "vehement stand" against Mr. Frank with a "plea that this was someone who was valuable to the district." Kavarsky Tr. 123.

Dr. Kavarsky believes that Mr. Frank's "size and appearance" was a "factor" in Ms. Lineal recommending against tenure. Kavarsky Tr. 107–08. Prior to Mr. Frank's case, no superintendent or assistant superintendent had ever vetoed one of Dr. Kavarsky's tenure recommendations. Kavarsky Tr. 124. Indeed, the District had a "general practice [ ] to defer to either the principal or the immediate supervisors" in making tenure decisions. Kavarsky Tr. 124.

Following this meeting, Dr. Fitzsimons decided not to recommend Mr. Frank for tenure. On May 4, 2004, he sent Mr. Frank a letter informing him of the decision. Def. Ex. Z. According to the letter, Dr. Fitzsimons decided against providing an "affirmative recommendation" for tenure because Mr. Frank: (1) used ineffective teaching techniques; (2) had poor execution of lesson planning; and (3) did not reach "the level of expectations of Lawrence Public Schools." Def. Ex. Z. Dr. Kavarsky does not believe Mr. Frank had "ineffective teaching techniques" and has "no clue as to what that means." Kavarsky Tr. 134. Likewise, Dr. Kavarsky also does not believe that Mr. Frank had "poor execution of lesson planning," and does believe that Mr. Frank met Lawrence's expectations for public school teachers. Kavarsky Tr. 134.

At a meeting held on May 19, 2004, Lawrence Board of Education members Frank Parise, Kathleen Raquet, Pamela Greenbaum, Rose Furcron Harris, and David Sussman voted to terminate Mr. Frank's employment. Def. Ex. AA. Asher Mansdorf was not present at the meeting and therefore did not vote on Mr. Frank's termination. *Id.*

On December 13, 2004, Mr. Frank filed a charge with the Equal Employment Opportunity Commission.

Long after Mr. Frank filed his discrimination complaint, Ms. Lineal kept a file on him in her office. Lineal Tr. 23. This file contained her "[a]necdotal notes of the two observations" and her "notes from the conferences." *Id.* But no one instructed Ms. Lineal to preserve this file, or other documents related to Mr. Frank's case. *Id.* at 24; Pl. Stmt. ¶¶ 80–81. And, when Ms. Lineal retired in January 2006, Defendants "shredded" her files, including her file on Mr. Frank. *Id.;* Pl. Stmt. ¶ 78. Defendants did so despite knowing about Mr. Frank's discrimination complaint. *Id.* at 24–25; Pl. Stmt. 78. Defendants claim that this shredding occurred due to an unwritten District policy to destroy documents when an employee retires. *Id.* at 26; Def. Stmt. ¶¶ 78–79.

Dr. Fitzsimons may also have deleted relevant e-mails, but he did so before learning about either Mr. Frank's informal or formal discrimination complaints. Fitzsimons Tr. 284–85.[1]

### DISCUSSION

#### I. *Standard of Review on Summary Judgment*

"Summary judgment is appropriate where there is no genuine dispute concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.),* 153 F.3d 61, 67 (2d Cir.1998) (citing Fed.R.Civ.P. 56(c)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee,* 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). "Mere conclusory allegations or denials will not suffice." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

In discrimination claims brought under the ADA and the NYSHRL, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. *See Ferraro v. Kellwood Co.* 440 F.3d 96, 99–100 (2d Cir.2006). That framework requires a plaintiff in a disability-discrimination case to establish a *prima facie* case of discrimination, after which the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action in question. *Id.* Once the

---

**1.** Pl. Stmt. ¶ 84 sets forth that Dr. Fitzsimons destroyed relevant documents "subsequent to learning of Mr. Frank's potential claims of discrimination." But the evidence does not support this assertion. In the cited deposition testimony, Dr. Fitzsimons testified only that he "generally" deletes e-mails, without mentioning either Mr. Frank's case or any specific time period.

defendant provides such a reason, the plaintiff must show "sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext" for discrimination. *Id.* (internal citations and quotations omitted).

## II. *Spoliation of Evidence*

■■■ As an initial matter, the Court must address Defendants' evidence spoliation. Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Spoliating evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998). This sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation. *See West*, 167 F.3d at 779. At the summary judgment stage, "an inference of spoliation, in combination with some (not insubstantial) evidence" can allow a plaintiff to survive summary judgment. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir.2001) (internal citations and quotations omitted). "Where one seeks an adverse inference regarding the content of destroyed evidence, one must first show

that the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed." *Id.* (internal citations and quotations omitted). Such an obligation arises when a "party has notice that the evidence is relevant to litigation." *Id.* But, to obtain an adverse inference, the "prejudiced party" must produce "some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Id.* at 108.

■ Here, the evidence shows that Ms. Lineal maintained a file "related to Michael Frank" in her office, which contained "[a]nectdotal notes from the two observations and the notes from the conferences." Lineal Tr. 23. And the evidence further shows that Defendants "shredded" this file in January 2006, long after Mr. Frank had filed a charge of discrimination with the EEOC. Lineal Tr. 24. In so doing, Defendants intentionally destroyed highly relevant documents (Ms. Lineal's own notes) that they should have preserved given Mr. Frank's pending discrimination complaint. Defendants failure to preserve Ms. Lineal's notes is particularly troubling, given that Dr. Kavarsky testified that she refused to share them with him during the debate over Mr. Frank's tenure, and otherwise refused to substantiate her claims that Mr. Frank failed to meet her tenure standards. *See* Kavarsky Tr. 89. Under these circumstances, the Court finds that Mr. Frank is entitled to an adverse inference that the destroyed notes would have supported his claims.[2]

---

2. Defendants contend that Ms. Lineal testified that she destroyed her notes after each tenure observation, citing Lineal Tr. 145. In so doing, Defendants blatantly misstate Ms. Lineal's testimony. Ms. Lineal testified that she destroyed the "lesson plans" that teachers submitted, not her own notes. Lineal Tr. 144–45. Indeed, Ms. Lineal expressly stated that she maintained "notes" from her "observations" of Mr. Frank in a file in her office. Lineal Tr. 23.

III. *Mr. Frank's Disability Discrimination Claims*

A. *Discrimination Under the ADA and the NYSHRL*

To establish a *prima facie* case of disability discrimination under the ADA or the NYSHRL, a plaintiff must show that: "(1) the employer is subject to the relevant statute; (2) the plaintiff is disabled within the statute's meaning; (3) the plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Heyman v. Queens Village Committee for Mental Health,* 198 F.3d 68, 72 (2d Cir.1999); *Attis v. Solow Realty Development Co.,* 522 F.Supp.2d 623, 627 (S.D.N.Y.2007) (standards for a *prima facie* case the same under NYSHRL).

Here, there is no dispute that Lawrence is subject to both the ADA and the NYSHRL, or that Mr. Frank is otherwise qualified to serve as a mathematics teacher. Thus, the only disputed questions concern: (1) whether Mr. Frank was disabled, or regarded as disabled, under the ADA, Rehabilitation Act and NYSHRL; and (2) whether Defendants discriminated against him based on that disability or perceived disability.

B. *Is Obesity a Disability?*

▮ Defendants correctly argue, and Mr. Frank does not dispute, that obesity is not a disability under the ADA. *See Francis v. City of Meriden,* 129 F.3d 281, 286 (2d Cir.1997). Similarly, because there is no evidence that Mr. Frank's obesity "constitute[d] or result[ed] in a substantial impediment to employment," Mr. Frank was also not disabled for Rehabilitation Act purposes. *See* 29 U.S.C. § 705(9); *Middleton v. CSX Transp., Inc.,* 06–CV–417, 2008 WL 846121, *2–3, 2008 U.S. Dist.

LEXIS 24977, *6–11 (N.D.Fla.2008) (obesity, by itself, is not a disability under the ADA or the Rehabilitation Act). Thus, Defendants are entitled to summary judgment on Mr. Frank's ADA and Rehabilitation Act claims predicated on Mr. Frank's alleged disability.

The law is less clear with respect to Mr. Frank's NYSHRL claim. In *State Div. of Human Rights on Complaint of McDermott v. Xerox Corp.,* 65 N.Y.2d 213, 219, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985), the New York Court of Appeals held that "clinically diagnosed" obesity constituted a disability under the NYSHRL. But then, in *Delta Air Lines v. New York State Div. of Human Rights,* 91 N.Y.2d 65, 72–73, 666 N.Y.S.2d 1004, 689 N.E.2d 898 (N.Y.1997), the Court of Appeals limited *Xerox.* There, the Court of Appeals rejected disability discrimination claims brought by plaintiffs who challenged Delta's weight requirements for flight attendants. Distinguishing *Xerox,* the Court held that the plaintiffs had failed to show that they were "medically incapable of meeting Delta's weight requirements due to some cognizable medical condition." *Id.* at 73, 666 N.Y.S.2d 1004, 689 N.E.2d 898. The Court stated that the presence of such a "condition" was "crucial in Xerox and is utterly absent here." *Id.* With the plaintiffs lacking such a condition, the Court found that their claims failed because "weight, in and of itself, does not constitute a disability" under the NYSHRL. *Id.*

There is little law interpreting *Delta.* In perhaps the only case discussing *Delta's* limits on *Xerox, Spiegel v. Schulmann,* 03–CV–5088, 2006 WL 3483922, *14–15, 2006 U.S. Dist. LEXIS 86531, *43–45 (E.D.N.Y. Nov. 30, 2006), the Court interpreted *Delta* as requiring plaintiffs asserting "weight" disability claims to show that their weight problems resulted from another medical

condition. *Id.* (rejecting plaintiff's claims because plaintiff failed to show that his "hypogonadism" "is related to [his] weight problem" and failed to introduce evidence showing that he "is medically incapable of losing weight").

■ This Court disagrees with *Spiegel's* interpretation. *Delta* stopped short of overturning *Xerox.* And, in *Xerox,* the plaintiff's obesity did *not* result "from any other disorder causally related" to her weight. 65 N.Y.2d at 219, 491 N.Y.S.2d 106, 480 N.E.2d 695. Rather, the plaintiff's obesity "was probably due to bad dietary habits." *Id.* Accordingly, this Court understands *Delta* to have distinguished *Xerox* on the grounds that, in *Xerox,* the plaintiff had "clinically diagnosed" obesity, and thus, a "cognizable medical condition," while the *Delta* plaintiffs did not. 65 N.Y.2d at 219, 491 N.Y.S.2d 106, 480 N.E.2d 695, 91 N.Y.2d at 73, 666 N.Y.S.2d 1004, 689 N.E.2d 898. Indeed, there is no indication that the *Delta* plaintiffs were even overweight. Rather, the issue concerned whether the plaintiffs satisfied Delta Airlines' weight requirements for flight attendants.[3] Thus, construing *Xerox* and *Delta* together, the Court understands New York's Court of Appeals to recognize NYSHRL disability claims predicated on "clinically diagnosed" conditions—such as obesity—but not claims based on weight alone.

**3.** In this regard, the Court notes that carrying a high weight does not, *ipso facto,* mean obesity. "[A]vid body build[ers]" who maintained perfectly healthy weights for their frames would have failed Delta's weight requirements just as easily as obese persons. *See, generally, Tudyman v. United Airlines,* 608 F.Supp. 739, 741 (C.D.Cal.1984). And, although not expressly stated in the *Delta* opinion, the Court takes judicial notice that airlines have rational economic reasons for favoring lighter flight attendants: saving fuel. *See, generally,* Ryan Mylrea, "A Growing Body of Law: Obesity, Disability, and the Air

## C. Was Mr. Frank Obese?

■ Because clinically diagnosed obesity is an NYSHRL disability, the question then turns to whether Mr. Frank was clinically obese during the applicable time period. The Court finds that Mr. Frank has satisfied his *McDonnell Douglas* burden for this prong. Specifically, Mr. Frank has produced affidavits from himself and his former treating physician, Dr. Paul Orbon, along with copies of Dr. Orbon's medical reports.[4] These medical reports establish that Mr. Frank weighed between 343 and 348 pounds in 2000 and 2001. Pl. Ex. EE. Dr. Orbon's affidavit sets forth that Mr. Frank's weight during this period constituted "morbid obesity," a "medically diagnosable condition." Pl. Ex. VV. Likewise, Mr. Frank's affidavit establishes that "[a]t all times in my employment, I was 6 feet, 5 inches tall and weighed approximately 340 pounds." Pl. Ex. UU. At the summary judgment stage, the Court considers it reasonable to infer that, if Mr. Frank was "morbidly obese" in 2000–2001 because he weighed between 343 and 348 pounds, he remained morbidly obese in 2003–2004, when he weighed "approximately 340 pounds." Thus, Mr. Frank has set forth a triable issue of fact concerning whether he was clinically obese when Defendants denied him tenure and then fired him.

Line Industry," 18 Tul. J. Int'l & Comp. L. 207, 210 (Winter 2009) ("average weight gain" of U.S. passengers in the 1990s caused airlines to "consume[ ] an extra 350 million gallons of jet fuel in the year 2000 alone").

**4.** Defendants contend that Dr. Orbon's affidavit is "inadmissible hearsay." The Court disagrees. On summary judgment, affidavits from treating physicians are admissible to establish a clinical diagnosis. *See Geoghan v. Long Island R.R.,* 06–CV–1435, 2009 WL 982451, *10 (E.D.N.Y.2009).

### D. Did Defendants "Regard" Mr. Frank as Disabled?

Mr. Frank also contends that Defendants "regarded" him as disabled. Specifically, in his affidavit, Mr. Frank sets forth that Ms. Lineal told him that his "size and weight were not conducive to learning" and "were preventing me from fulfilling the job functions of a teacher." Pl. Ex. UU.

Defendants contend that this statement should not be considered because "it attempts to edit [Mr. Frank's] prior testimony" in deposition and is "at best, a prior inconsistent statement." Def. Reply Br. at 4–5. The Court disagrees. True, Mr. Frank did not testify about these statements during his deposition. But he "failed" to do so for a simple reason: he was never asked. Frank Tr. 5053. Indeed, a review of the transcript shows that, although Defendants asked Mr. Frank about his claim that Ms. Lineal called him "big and sloppy," they never inquired about the Complaint's allegation that Ms. Lineal "openly stated . . . that Mr. Frank's obesity was not conducive to learning and would somehow prevent him from being able to perform the essential functions of a seventh grade math teacher." Compl. ¶ 40; Pl. Ex. CC (March 29, 2004 letter complaining of discrimination). Likewise, Defendants did not ask any general questions such as "did Ms. Lineal say anything else to you?" The Court cannot fault Mr. Frank for not answering a question he was never asked, nor can it fault him for not volunteering information that was non-responsive to the questions he

was asked. Accordingly, the Court admits Mr. Frank's "regarded as" affidavit testimony for purposes of summary judgment. And, having admitted this evidence, the Court finds that it suffices to show that Ms. Lineal regarded him as disabled. See Branson v. Ethan Allen, Inc., 2004 WL 2468610, *4, 2004 U.S. Dist. LEXIS 22135, *11–12 (E.D.N.Y. Nov. 3, 2004) (recognizing a NYSHRL claim for being "regarded as" disabled due to obesity).

Mr. Frank also asserts "regarded as" claims under the ADA and the Rehabilitation Act. For the same reasons that Mr. Frank's "regarded as" claim survives summary judgment under the NYSHRL, it also survives under the ADA and the Rehabilitation Act.[5]

### E. Did Mr. Frank Suffer an Adverse Employment Action due to his Obesity?

The final element of Mr. Frank's prima facie case concerns whether he suffered an adverse employment action due to his obesity, or due to Defendants regarding him as disabled. Here, Mr. Franks has submitted ample amounts of direct and circumstantial evidence to establish Defendants' discriminatory animus. Viewing the evidence in the light most favorable to Mr. Frank, Mr. Frank has shown—among other things—that: (1) both Mr. Frank and Dr. Kavarsky testified that Ms. Lineal made inappropriate comments about Mr. Frank's weight and appearance, although they differed on certain details (i.e., whether she called Mr. Frank "big and sloppy" or a "big man"); (2) Ms. Lineal put the

---

5. Butterfield v. New York State, 96–CV–5144, 1998 WL 401533, *12 (S.D.N.Y.1998) (permitting an obesity-related "regarded as" claim to survive summary judgment); Nedder v. Rivier College, 944 F.Supp. 111, 119 (D.N.H.1996) ("regarded as" claim survived summary judgment because evidence indicated that defendants "believed that obese teachers are perceived by students as less disciplined and less intelligent and as making unsuitable role models"); see also Francis v. City of Meriden, 129 F.3d 281, 286 (2d Cir.1997) (stating, in dicta, that "a cause of action may lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese").

"kibosh" on Mr. Frank's tenure, but failed to support or justify her reasoning; (3) Mr. Akst inexplicably replaced Dr. Kavarsky as Mr. Frank's supervisor, even though he had no experience supervising math teachers, possibly because Ms. Lineal could exert improper influence over him; (4) after meeting with Ms. Lineal, Mr. Akst reversed his position on granting Mr. Frank tenure; (5) Dr. Kavarsky strongly supported Mr. Frank, and his tenure recommendations had never been overruled before; and (6) after learning about Mr. Frank's discrimination complaint, Defendants purposefully destroyed Ms. Lineal's file on Mr. Frank, which included "[a]nectodal notes" she took while observing his classroom performance.

In addition, even if Defendants arguably set forth legitimate non-discriminatory reasons for denying Mr. Frank tenure and firing him, Mr. Frank has more than shown—for summary judgment purposes—that these reasons were a pretext. Among other things, Mr. Frank has set forth that: (1) issues serious enough to deny tenure are typically mentioned in a teacher's annual appraisals; (2) Mr. Frank's annual appraisals did not list any of these purported problems with his performance and, in fact, praised his work; (3) Mr. Frank's own principal, Dr. Kavarsky, has "no clue" what Mr. Frank's supposed "ineffective teaching techniques" were, and likewise rejects Defendants' claim that Mr. Frank had "poor execution of lesson planning" and did not meet Lawrence's expectations; and (4) Defendants granted tenure to several non-obese teachers with similar purported performance issues. *See supra* at 162–66; Pl. Stmt. ¶¶ 227–233.

Accordingly, the Court finds that: (1) Mr. Frank's ADA and Rehabilitation Act claims survive on a "regarded as" disabled theory; and (2) Mr. Frank's NYSHRL claim survives on both a disability discrimination theory and a "regarded as" theory.

## IV. *Mr. Frank's Retaliation Claims*

Mr. Frank also alleges retaliation. In order to establish a *prima facie* retaliation case, Mr. Frank must show that: (1) he engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002). In establishing a *prima facie* case, Mr. Frank's burden "is *de minimis.*" *Id.*

Here, Mr. Frank contends that, after Mr. Akst told him that he was no longer being recommended for tenure, Mr. Frank complained about discrimination and informed Mr. Akst that he would seek counsel from an employment attorney. Def. Stmt. ¶ 203 (admitting Pl. Stmt. ¶ 203). In so doing, Mr. Frank engaged in a protected activity, and made his employer aware of this activity, meeting the first two prongs of his *prima facie* case. *Amin v. Akzo Nobel Chemicals, Inc.*, 282 Fed. Appx. 958, 961 (2d Cir.2008) ("Informal complaints ... are protected activity"); *Felton v. Katonah Lewisboro School Dist.*, 08–CV–9340, 2009 WL 2223853, *6 (S.D.N.Y.2009) ("it is clear that informal complaints to management are considered protected activity under the Rehabilitation Act and the ADA").

Mr. Frank further sets forth that, almost immediately after he complained, Mr. Akst conducted an unannounced "drop in" observation of Mr. Frank's teaching. Pl. Stmt. ¶¶ 204–206. Mr. Akst then drafted "by far the harshest criticism of Mr. Frank's teaching techniques." Pl. Stmt. ¶¶ 204–206. In so evidencing, Mr. Frank has met the third prong of his *prima facie*

case. *See Siddiqi v. New York City Health & Hospitals Corp.*, 572 F.Supp.2d 353, 372 (S.D.N.Y.2008) (in the retaliation context "negative performance reviews, standing alone, can be considered an adverse employment action"); *see generally Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (for retaliation purposes, an adverse action is any conduct "that a reasonable employee would have found ... materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination").

The question thus turns to whether Mr. Frank has sufficiently shown that a "causal connection" exists between his complaint and the negative performance evaluation he received. The Court finds that he has. Viewed in the light most favorable to Mr. Frank, the evidence establishes that Mr. Akst did not typically conduct unannounced "drop in" observations. Kavarsky Tr. 128 ("It was not George Akst's practice to do drop-ins for formal observations"). Yet, Mr. Akst conducted such an unscheduled "drop in" just a few days after Mr. Frank's complaint. *See Heinemann v. Howe & Rusling*, 529 F.Supp.2d 396, 412 (W.D.N.Y.2008) (temporal proximity a factor in finding a causal connection). And, despite Mr. Frank having previously received favorable annual appraisals, this unscheduled observation culminated in what was, arguably, Mr. Frank's harshest performance review ever. Pl. Ex. R; *see Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998) (favorable performance reviews up until protected activity evidence of pretext), *abrogated on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Mr. Frank also asserts a retaliation claim predicated on Defendants supposedly providing him with bad references to the South Huntington school district. But, at most, Mr. Frank can only speculate that these references were bad and retaliatory. Pl. Opp. Br. at 24. Moreover, Mr. Frank did not list any Defendant as a reference. Instead, Mr. Frank listed Dr. Kavarsky, who strongly supported his tenure recommendation, and Jeffrey Berke, a fellow teacher who was Mr. Frank's personal friend. Frank Tr. 17, 84. Mr. Frank has provided no facts which would enable the Court to infer that either Dr. Kavarsky or Mr. Berke retaliated against Mr. Frank by providing a bad reference to South Huntington.

In short, Mr. Frank's retaliation claims survive only insofar as they are predicated on Mr. Akst's unannounced classroom observation and subsequent report.

## V. *Mr. Frank's Reasonable Accommodation Claims*

██ Mr. Frank also asserts claims based on Defendants supposedly violating their duty to reasonably accommodate his disability. But these claims fail because Mr. Frank never requested any accommodations. Frank Tr. 22, 42, 74, 75; *Vazquez v. Southside United Housing Devel. Fund Corp.*, 06–CV–5997, 2009 WL 2596490, *11 (E.D.N.Y.2009) (collecting cases). And, in fact, Mr. Frank affirmatively testified that he "didn't think" he was "physically impaired in any way" and did not require any assistance to perform his teaching duties. *Id.* at 9–10. Consequently, summary judgment is appropriate with respect to Mr. Franks' third, sixth and tenth causes of action.

## VI. *Individual Liability*

██ Defendants seek summary judgment, in part, on the grounds that the

Individual Defendants cannot be held liable under the ADA or the Rehabilitation Act. The Court agrees that the ADA and Rehabilitation Act do not confer individual liability. Nevertheless, this portion of Defendants' motion fails for the simple reason that Mr. Frank did not, in fact, assert claims against any Individual Defendant under these statutes. Rather, Mr. Frank asserted his ADA and Rehabilitation Act claims only against the "Lawrence Defendants," which Mr. Frank expressly defined as "Lawrence Union Free School District, Lawrence Public Schools, [and] Lawrence Union Free School District Board of Education." *See* Compl. pp. 1, 17–23.

■ Defendants also seek summary judgment on Mr. Frank's ninth cause of action, which seeks to impose individual liability under the NYSHRL on an "aiding and abetting" theory. In this regard, Defendants principally contend that, under the NYSHRL, an individual cannot "aid and abet" his own conduct. Def. Br. at 18–20. The Court disagrees. In *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), the Second Circuit held that the NYSHRL's aiding and abetting section imposes individual liability on a person who "actually participates" in the improper conduct. The New York Court of Appeals has never held otherwise. Thus on this point, *Tomka* remains both good law and binding precedent.[6]

Defendants also contend that Dr. Fitzsimons, Mr. Akst and Ms. Lineal cannot be held individually liable because, although they recommended that the Board not award tenure and fire Mr. Frank, they lacked the power to engage in these actions themselves, citing *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984).

The Court agrees that Dr. Fitzsimons, Mr. Akst and Ms. Lineal lacked the power to deny Mr. Frank tenure or fire him. But that absolves them of individual liability only under N.Y. Exec. L. § 296(1). It does not shield them from individual liability under an aiding and abetting theory, as set forth in § 296(6). *See Perks v. Town of Huntington*, 251 F.Supp.2d 1143, 1160 (E.D.N.Y.2003). And, as discussed above, aiding and abetting requires only "actual[ ] particpat[ion]" in the discriminatory conduct. *Id.*

Finally, Defendants contend that the Defendant Board Members (Frank Parise, Kathleen Raquet, Pamela Greenbaum, Rose Furcron Harris, Asher Mansdorf and David Sussman) cannot face individual liability because they just rubber-stamped Dr. Fitzsimons' recommendations, and further note that Mr. Mansdorf was absent when the Board denied Mr. Frank tenure and fired him. Def. Br. at 18–19. Thus, Defendants argue, Mr. Frank cannot show that the Board Members possessed any discriminatory animus. *Id.* In response, Mr. Frank implicitly concedes that Mr. Mansdorf's absence absolves him from individual liability. But Mr. Frank argues that the other Board Members face individual liability because, despite knowing about Mr. Frank's discrimination complaint, they approved Dr. Fitzsimons' recommendations without investigating whether Dr. Fitzsimons made these recommendations for discriminatory reasons. Pl. Opp. Br. at 25; Pl. Ex. CC. The Court only partially agrees. Through his attorney's March 29, 2004 letter, Mr. Frank has set forth admissible evidence showing that Mr. Parise knew, or should have known, about his discrimination complaint. Pl. Ex. CC. But there is no evidence to sug-

---

**6.** *See, e.g., Maher v. Alliance Mortg. Banking Corp.*, 650 F.Supp.2d 249, 262–63 (E.D.N.Y. 2009); *Prince v. Madison Square Garden*, 427 F.Supp.2d 372, 385 (S.D.N.Y.2006); *Rizzo v. Niagara Mohawk Power Corp.*, 04–CV–1507, 2006 WL 1742487, *7 (N.D.N.Y.2006)

gest that Mr. Parise, or anyone else, forwarded this letter to the other Board Members. Nor is there any evidence to indicate that such letters were typically forwarded to the entire Board. And Mr. Frank has put forth no other evidence to suggest that the Board knew about his complaint prior to taking adverse action against him. Consequently, Defendants Raquet, Greenbaum, Harris, Mansdorf and Sussman are entitled to summary judgment on Plaintiff's individual liability claims.

VII. *Plaintiff's Sanctions Motion*

Mr. Frank has also moved for sanctions (apparently under the Court's inherent power) in connection with Defendants' Rule 56.1 Statement. Specifically, Mr. Frank objects to the fact that Defendants first filed their Rule 56.1 Statement on October 15, 2007, and then covertly filed an Amended Rule 56.1 Statement on March 3, 2008, without labeling it "Amended" or otherwise indicating (except for dating it "March 3, 2008") that Defendants had revised it. Mr. Frank further notes that Defendants' unlabeled Amended Statement initially led to the Court incorrectly concluding that Mr. Frank had not fully responded to Defendants' Statement of Undisputed Material Facts. *See* Docket No. 53. Defendants respond that nothing in the Local Rules or this Court's Individual Practices prevented them from amending their statement, and it is Plaintiff counsel's "own fault" that he initially failed to notice the revisions.

■ The Court agrees with Defendants that nothing precluded them from amending their Rule 56.1 Statement. But Mr. Frank is correct that Defendants should have put him on notice that they amended their statement, as a matter of good form and professional courtesy. Indeed, in practically every other case before

this Court in which a party has revised its Rule 56.1 Statement or Counter–Statement, they have expressly labeled the new submission as an "Amended" or "Revised" Rule 56.1 Statement. This comports with the general practice that revised pleadings, discovery responses and court submissions should distinguish themselves from their predecessor by being labeled "Amended" or "Revised." *See, generally, Wilson v. First Franklin Financial Corp.,* 08–CV–2572, 2010 WL 367785, *1 (E.D.Cal.2010) (requiring any amended complaint to be labeled "Amended Complaint"); *Contreras v. Moreno,* 09–CV–0087, 2009 WL 508605, *2 (E.D.Cal.2009) (recommending dismissal because plaintiff's assorted filings did not constitute a "clearly labeled amended complaint"). Here, Defendants failed to do so.

But, although Defendants' counsel's conduct was unprofessional, it ultimately resulted in no prejudice to Mr. Frank. So the Court declines to impose sanctions. However, the Court strongly cautions Defendants' counsel that, if they wish to submit an amended filing in this Court again, they should clearly label any such a filing as "Amended" or "Revised."

*CONCLUSION*

Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

Summary judgment is GRANTED IN PART AND DENIED IN PART with respect to Plaintiff's First and Fourth causes of action (discrimination under the ADA and the Rehabilitation Act). These causes of action may proceed only on a theory that the Lawrence Defendants "regarded" Mr. Frank as disabled.

Summary judgment is GRANTED IN PART AND DENIED IN PART with respect to Plaintiff's Second and Fifth causes

176

of action (retaliation under the ADA and the Rehabilitation Act). This cause of action may proceed only on a theory that Mr. Akst retaliated against Plaintiff by conducting an unannounced "drop in" observation of Plaintiff's class, and then crafting an overly harsh critique of this lesson.

Summary judgment is GRANTED with respect to Plaintiff's Third, Sixth, and Tenth causes of action (failure to grant reasonable accommodation).

Summary judgment is GRANTED IN PART AND DENIED IN PART with respect to Plaintiff's Seventh and Eighth causes of action (discrimination and retaliation under the NYSHRL). Summary judgment is GRANTED as to Defendants Lineal, Fitzsimons, Raquet, Greenbaum, Harris, Mansdorf, Sussman and Akst, because Mr. Frank has not shown that individual liability attaches to these Defendants under N.Y. Exec. Law § 296(1). Summary judgment is DENIED as to the Lawrence Defendants and Defendant Parise.

Summary judgment is GRANTED IN PART AND DENIED IN PART with respect to Plaintiff's Ninth cause of action (aiding and abetting under the NYSHRL). Summary judgment is GRANTED as to Defendants Raquet, Greenbaum, Harris, Mansdorf and Sussman. It is DENIED as to Defendants Lineal, Fitzsimons, Parise and Akst, because Mr. Frank has shown that individual liability may attach to these Defendants under N.Y. Exec. Law § 296(6).

Plaintiff's motion for sanctions is DENIED.

SO ORDERED.